167 N.J. Super. 141 (1979)
400 A.2d 554
LEONIDAS EXADAKTILOS, PLAINTIFF,
v.
CINNAMINSON REALTY CO., INC. A/K/A HATHAWAY'S LODGE, INC., A NEW JERSEY CORPORATION, AND GEORGE SKORDAS, VASELIOS MALANOS AND PETER MARLAS, INDIVIDUALLY AND AS DIRECTORS OF CINNAMINSON REALTY CO., INC. A/K/A HATHAWAY'S LODGE, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 2, 1979.
*144 Mr. Norman Shabel for plaintiff.
Mr. Louis A. Colaguori for defendants (Messrs. Bookbinder, Colaguori & Bookbinder, attorneys).
HAINES, J.S.C.
The "oppressed shareholder" is a litigant newly created by Legislative amendment to the New Jersey Corporation Act. See N.J.S.A. 14A:12-7. Plaintiff Leonidas Exadaktolis, claims to be one. He alleges that he purchased a 20% interest in defendant corporation, which owns and operates a restaurant. The corporation has three other stockholders, the respective owners of 20%, 20% and 40% of its stock. George Skordas holds the 40% interest. That a stock certificate representing 20% of the corporation's outstanding shares was issued to plaintiff at a cost of $20,000 is undisputed, but defendants allege that the stock was actually paid for by defendant Skordas, plaintiff's father-in-law. As a consequence, it is said that the stock is subject to a resulting trust. Since plaintiff seeks to qualify for the relief afforded "oppressed" shareholders, resolution of the dispute concerning ownership necessarily precedes an evaluation of the merits of this claim.
Plaintiff traced the money he used to purchase the stock to several sources. Five thousand dollars, saved from wages *145 earned by working on ships, accompanied plaintiff when he entered this country. Upon marrying Skordas' daughter in 1969, cash wedding gifts in the amount of $3,800 were received and set aside. During that same year he saved $100 a week from his wages, a total of $5,200. In 1970 his income increased and he was able to save $7,800 from his wages. In 1969 and 1970 he sold a truck for $1,200, saving all the proceeds as well as $1,800 awarded to his wife because of her involvement in an accident. Plaintiff testified that after 1970 he was unable to save money because his wife had a child and stopped working. All of these monies reportedly were kept in a box in plaintiff's closet because he did not trust banks. His savings totalled $24,000, more than enough to enable him to advance the $20,000 necessary to purchase the stock.
On cross-examination plaintiff's income tax returns were introduced into evidence. The 1969 return reflected an income for both him and his wife of $8,695, with $5,620.90 representing his wife's earnings. A saving of $5,200 in that year would have left only $3,495.10 available for living expenses. The only wages listed for plaintiff was the year's total of $286 paid by a painter for whom plaintiff had worked. This return contradicted plaintiff's testimony that he had earned $120 to $135 a week as a painter, plus $45 to $60 a week by working in a diner during that year. The 1970 return showed total earnings of $8,619.31 of which his wife accounted for $6,210.47. Had plaintiff saved $7,800 that year, the family would have had $819.31 left for living expenses. Plaintiff said that he made over $180 a week as a partner with his brother in a painting business during that year. The partnership information return showed only $1,480 paid to him. Plaintiff did not produce any records to support his claim of receiving over $180 a week. Nor did his brother, who testified as to other matters, verify this statement. Finally, no income tax return disclosed the sale of a truck for $1,200. Plaintiff explained these discrepancies by claiming that the tax returns were "wrong," that he depended *146 on his wife to prepare them or have them prepared, and that he was not aware that he had to report all of his income for federal tax purposes.
Plaintiff admitted he had not declared his possession of $5,000 when he entered this country. The $1,800 saved from his wife's accident was reflected in a check to her actually totalling $1,942.47. The check was dated March 16, 1973. The $20,000 in cash advanced for the stock was paid prior to December 1972; the accident monies could not have been available to plaintiff at that time.
Plaintiff justified the risky arrangement of keeping money in a closet on the ground that he did not trust banks. It developed, however, that he had several bank accounts. Although he claimed that the accounts were used merely to establish credit, they also were used to accumulate savings.
On cross-examination plaintiff said the monies saved in the closet amounted to exactly $20,000. On redirect he amended this testimony and said the amount may have varied either way by about $200. Each of these statements stand in contradiction to his testimony on direct examination.
Skordas, on the other hand, had substantial monies and was plaintiff's father-in-law at the time of the stock transaction. No testimony indicated any rift between them at the time the stock was purchased. The opportunity to make an investment in the restaurant was provided to plaintiff by Skordas. He defended his son-in-law from criticism by other principals of the corporation. After the restaurant had been purchased, improvements were made, the cost being borne in part by the corporation's principals and in part with borrowed money. Skordas loaned his son-in-law $20,000 to cover his share of the improvements, taking an unsecured promissory note as payment for the loan. These facts demonstrate that Skordas was interested in plaintiff's welfare and generous in making money available on an informal basis.
The only person present at the time plaintiff supposedly gave the $20,000 in cash to his father-in-law, according to plaintiff's testimony, was his wife. She was not produced as *147 a witness to this transaction or to any other relevant fact, although she was available since she was, in fact, in the courtroom during most of the trial. Apparently, she was not deposed. These circumstances may be explained by the fact that plaintiff and his wife were then involved in divorce proceedings so that she may have been a hostile witness, but this was not shown. It was revealed in the course of the trial that she had certain relevant records, not subpoenaed by plaintiff, which may not have been privileged. See Evid. R. 28. These matters damage plaintiff's credibility. Skordas' credibility is also tarnished; he, too, failed to produce his daughter as a witness.
Plaintiff's testimony is so riddled with contradictions and qualifications as to lead to the conclusions that he is not a credible witness, that he did not have $20,000, and that he did not pay for the stock. Consequently, it must be Skordas alone who advanced money from his adequate funds to purchase the stock. These findings, however, do not carry the day for defendants. Legal title to the stock resides in plaintiff and his claim of "oppression" must be considered unless the stock is subject to a resulting trust that vests beneficial ownership thereof in Skordas.
It is a general rule that "a resulting trust will be declared in favor of the one paying the purchase price of property transferred to another unless it is shown that the one paying the price manifested an intention that no resulting trust should arise." Weisberg v. Koprowski, 17 N.J. 362, 371 (1955). This rule raises only a rebuttable presumption, however, designed to provide guidance to the court in determining true intent. Fowler v. Scott, 8 N.J. Super. 490 (Ch. Div. 1950); Turro v. Turro, 38 N.J. Super. 535 (App. Div. 1956). A contrary presumption, namely, that a gift or advancement was intended and not a resulting trust, arises when certain relationships, such as blood or marriage, exist between the payor and the transferee.
*148 * * * [T]he application of the rule inferring a gift to a transferee related to the payor is not to be determined on considerations of the closeness of the relationship or the extent of natural affection, nor by reason of any legal obligation to furnish support * * * [it is] the preference of modern decisions for a determination based upon whether the grantee is a natural object of bounty of the payor, that is, * * * whether he stands in such a relationship "that it is probable that the payor intends to make a gift to the transferee" * * *. [Weisberg v. Koprowski, supra at 372-373]
See Turro v. Turro and Fowler v. Scott, supra. The presumption of a gift, when such a relationship is present, supersedes the presumption of a resulting trust and casts the burden of proof upon the party attempting to establish the trust. Turro v. Turro, supra. Plaintiff was married to Skordas' daughter and had fathered his grandchild at the time the monies were advanced. This relationship made plaintiff the natural object of Skordas' bounty, raising a presumption that the monies used to purchase the stock were given or advanced to plaintiff. See Restatement, Trusts, 2d, Comment to § 442. The burden of overcoming this presumption was upon Skordas. Id., § 443.
Skordas' testimony was not helpful to his cause. At best, it provided limited support for a claim, not made by Skordas in this suit and later rejected in this opinion, that he loaned the money to plaintiff. He testified that he agreed to "put up" the money to enable plaintiff to go into the restaurant business with him when plaintiff said he had no funds. On cross-examination, he said that he had told plaintiff the $20,000 could be paid back later, but denied any discussion concerning the ownership of the stock. This testimony is contrary to his deposition in which he said the stock was to be turned over to plaintiff only if he learned the business and paid his father-in-law back the monies advanced. A revealing parallel circumstance involves a loan by Skordas to Peter Marlas, another principal in the corporation, not related to Skordas. When Skordas was deposed, he testified that the loan to Marlas was made upon the understanding *149 that the latter's shares belonged to Skordas until the loan was repaid. At trial, however, he said that Marlas' shares were not subject to any reservation of title. This evidence not only affects Skordas' credibility, but also makes it seem unlikely that he would have intended to hold title to his son-in-law's stock when he did not do so with someone who was not related to him. William Malanos, another principal of the corporation, testified that he did not know of any arrangement under which Skordas was to have the beneficial interest in the shares issued to plaintiff, although Skordas had told him about a "loan" to Exadaktolis.
After the stock certificate was delivered to plaintiff, he became comaker of a corporate note given to a bank to secure a loan of $220,000, as to which he also signed a personal guarantee. The assumption of that liability by one who had no interest in the corporation is most unlikely. There is a similar inconsistency in Skordas' loan of $20,000 to plaintiff for his contribution to corporate improvements and the assertion by Skordas that he did not intend plaintiff to obtain a beneficial interest in the stock. No evidence indicates any action or statement by Skordas evincing any interest in the stock until this suit was commenced. It is an inescapable conclusion that no resulting trust arose with respect to plaintiff's stock. In fact, Skordas' own testimony denies any intention on his part to have his son-in-law hold the stock in his name for Skordas' benefit.
Nor does Skordas' testimony, or any other evidence, provide adequate proof that the $20,000 was loaned to his son-in-law. When he advanced these monies he took no note or other evidence of indebtedness from plaintiff and required no security; he has never received any interest on the money and has made no claim for repayment in his pleadings or otherwise. The only testimony concerning a possible loan is Skordas' statement on cross-examination that he told plaintiff the money could be paid back later. He said nothing about this in his direct testimony. Although Malanos said he had been told by Skordas that the money was loaned, that *150 testimony is admissible as a declaration against interest regarding Skordas' trust claim but is inadmissible hearsay on the loan question. I conclude that the evidence was entirely inadequate to support the claim that the $20,000 was loaned to plaintiff. The presumption of gift has not been overcome.[1]
It follows from this analysis that plaintiff must be treated as the owner of a 20% interest in defendant corporation. Consequently, the merits of his oppression claim require consideration.
N.J.S.A. 14A:12-7(1)(c) provides as follows:
1. The Superior Court, in an action brought under this section, may appoint a custodian, appoint a provisional director, order a sale of the corporation's stock as provided below, or enter a judgment dissolving the corporation, upon proof that
* * * * * * * *
(c) In the case of a corporation having 25 or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.
No New Jersey decision has interpreted this statutory provision. Many other jurisdictions have enacted provisions similar to that which took effect in New Jersey in 1974. See Note, "Oppression of Minority Shareholders: A Proposed Model and Suggested Remedies," 44 Miss. L.J. 476, n. 1 (1976). Nonetheless, relatively few cases have discussed the concept of "oppression."
In Illinois, the first American jurisdiction to adopt this type of provision, id. at 476, the courts have proceeded more by saying what oppression is not than what it is:
*151 We have held that the word "oppressive" as used in this statute, does not carry an essential inference of imminent disaster; it can contemplate a continuing course of conduct. The word does not necessarily savor of fraud, and the absence of "mismanagement, or misapplication of assets," does not prevent a finding that the conduct of the dominant directors or officers has been oppressive. It is not synonymous with "illegal" and "fraudulent." [Gidwitz v. Lanzit Corrugated Box Co., 20 Ill.2d 208, 170 N.E.2d 131, 135 (Sup. Ct. 1960)]
See Central Standard Life Insurance Company v. Davis, 10 Ill.2d 566, 141 N.E.2d 45, 50 (Sup. Ct. 1957). The Illinois courts have also expressed a concern that corporate formalities be obeyed, see Gidwitz v. Lanzit Corrugated Box Co., supra, and an Illinois appellate court has held that corporate decisions within the "business judgment rule" cannot be made the basis of an oppression claim, see Polikoff v. Dole & Clark Building Corp., 37 Ill. App.2d 29, 184 N.E.2d 792, 795-96 (App. Ct. 1962). The business judgment rule instructs that a decision made by a board of directors pertaining to the manner in which corporate affairs are to be conducted should not be tampered with by the judiciary so long as the decision is one within the power delegated to the directors and there is no showing of bad faith. See Sarner v. Sarner, 62 N.J. Super. 41, 60 (App. Div. 1960), rev'd and rem. on other grounds, 38 N.J. 463 (1962); Edison v. Edison United Phonograph Co., 52 N.J. Eq. 620, 626-27 (Ch. 1894). The possibility raised in Gray v. Hall, 10 Ill. App.3d 1030, 295 N.E.2d 506, 509 (App. Ct. 1973), however, that corporate salary and dividend policy might constitute oppressive behavior under certain circumstances, casts considerable doubt on the continued validity of this business judgment exclusion in Illinois.
The Supreme Court of Virginia has adopted the Illinois reasoning and in addition has quoted with approval language from English cases interpreting the term "oppression" in a similar enactment.
*152 In this context it has been held that oppressive means "* * * a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." Elder v. Elder & Watson, Ltd. (1952) Sess. Cas. 49, 55. It has also been held to mean "* * * a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members." Scottish Co-op. Wholesale Society, Ltd. v. Meyer (1958), 3 All. E.R. 66, 86 (H.L.). [White v. Perkins, 213 Va. 129, 189 S.E.2d 315, 319-320 (Sup. Ct. 1972)]
The Supreme Court of Oregon also turned to the English cases for guidance in Baker v. Commercial Body Builders, Inc., 264 Or. 614, 507 P.2d 387, 393 (Sup. Ct. 1973).
While the terminology employed by both the statute and case law certainly provides the court with the latitude necessary to deal with all the circumstances peculiar to any case brought to its attention, it fails to suggest any perspective from which to judge what is oppressive or unfair. Such perspective can be attained through a reading of the statute as a whole and of comments pertaining to it and similar enactments.
The oppression remedy is available only to individuals participating in corporations with less than 25 shareholders. The Commissioners' Comment appended to N.J.S.A. 14A:12-7 indicates that this limitation was imposed to preclude strike suits against large corporations. Additionally, in most instances the market place provides a remedy for those shareholders who feel that they are being oppressed by a large corporation, i.e., they can sell their stock. That remedy is not readily available to minority shareholders in close corporations. The statute was designed therefore to solve a problem peculiar to them.
That problem arises in "shareholder `freeze out' situations", see Final Report of the Corporate Law Revision Commission 12, N.J.S.A. 14A (cum. supp. 1978), defined by one commentator as meaning
*153 * * * a manipulative use of corporate control or inside information to eliminate minority shareholders from the enterprise, or to reduce to relative insignificance their voting power or claims on corporate earnings and assets or otherwise to deprive them of corporate income or advantages to which they are entitled. [2 O'Neal, Close Corporations (2d ed. 1971), § 8.07 at 43]
A host of techniques can be employed to freeze out minority shareholders. See O'Neal, Oppression of Minority Shareholders, cc. 2-6 (1975). The Commissioners' Comment to this section points to removal of minority shareholders from corporate offices and substantial diminution of their power or compensation as examples of freeze-out techniques. In determining whether oppression is present, the statute expressly authorizes an examination of corporate conduct toward a minority shareholder in the role of shareholder, director, officer or employee. In this regard New Jersey is almost unique because most oppression provisions limit the examination to the effect of corporate conduct on a minority shareholder in his guise of shareholder and no more. See Id. at 484 and n. 42.
The focus and scope of this inquiry recognizes that the different circumstances impelling the formation of large as opposed to close corporations lead their shareholders to harbor different expectations. Large corporations are usually formed as a means of attracting capital through the sale of stock to investors, with no expectation of participation in corporate management or employment. Profit is expected through the payment of dividends or sale of stock at an appreciated value. See Tinney, "Oppressive Conduct by Majority Shareholders, Directors, or Those in Control of Corporation," 5 Proof of Fact, 2d 645, 652 (1975). Close corporations, in contrast, are frequently formed by individuals most aptly described as partners. See Note, "Relief to Oppressed Minorities in Close Corporations: Partnership Precepts and Related Considerations," 1974 Ariz. St. L.J. 409, 411-413. These persons desire the tax benefits, the insulation from personal liability and the perpetual life that *154 flows from the corporate form. See Cary, Corporations, 20-21, 362-63 (1969). The amassing of capital through the sale of stock to investors is at best of secondary importance. The personal relationship between shareholders which is more or less peculiar to and usually antedates the formation of close corporations, see O'Neal & Magill, "California's New Close Corporation Legislation," 23 U.C.L.A.L. Rev. 1155, 1166-1169 (1976), makes it impossible to hypothesize a set of expectations that will be held in common by all minority shareholders in these corporations. Unlike their counterparts in large corporations, they may expect to participate in management or to influence operations, directly or indirectly, formally or informally. See Tinney, "Oppressive Conduct by Majority Shareholders, Directors, or Those in Control of Corporation," supra. Furthermore, there generally is an expectation on the part of some participants that their interest is to be recognized in the form of a salary derived from employment with the corporation. See Note, "Relief to Oppressed Minorities in Close Corporations: Partnership Precepts and Related Considerations," supra at 412.
Thus, the statutory language embodies a legislative determination that freeze-out maneuvers in close corporations constitute an abuse of corporate power. Traditional principles of corporate law, such as the business judgment rule, have failed to curb this abuse. Consequently, actions of close corporations that conform with these principles cannot be immune from scrutiny. To implement the intent of the Legislature, a method must be developed whereby it can be decided when a particular course of corporate conduct has resulted in the oppression of a minority shareholder.
The special circumstances, arrangements and personal relationships that frequently underly the formation of close corporations generate certain expectations among the shareholders concerning their respective roles in corporate affairs, including management and earnings. These expectations preclude the drawing of any conclusions about the *155 impact of a particular course of corporate conduct on a shareholder without taking into consideration the role that he is expected to play. Accordingly, a court must determine initially the understanding of the parties in this regard. Armed with this information, the court can then decide whether the controlling shareholders have acted in a fashion that is contrary to this understanding or in the language of the statute, "have acted oppressively * * * toward one or more minority shareholders."
The expectations of the parties in the instant suit with regard to their participation in corporate affairs are not established by any agreement; they must be gleaned from the evidence presented. Here the corporation is close and small and operates a single restaurant. Three of its shareholders had lengthy experience in the restaurant business prior to the corporation's formation. Although the corporation operates, technically, with one director who is not the largest stockholder, its business decisions actually have been made informally by these three shareholders. Except for its organizational meeting, no director or shareholder meetings have been held since the corporation's inception in 1972. Plaintiff, the fourth shareholder, had no restaurant experience at the time he received his stock as a gift from his father-in-law. By giving him the stock, Skordas sought to provide him with an opportunity to learn the restaurant business and eventually take part in its management.
There is some indication that plaintiff's opportunity was extended over the objections of the other two shareholders and it is clear that they never welcomed him as a fellow participant in the enterprise. The evidence shows that plaintiff failed to get along with employees, causing the loss of key personnel, that he quit on more than one occasion, without reason or notice, and that he was not compatible with the other principals. Plaintiff's discharge from employment with the corporation, therefore, was because of his unsatisfactory performance.
*156 The circumstances under which the parties' expectations in these areas were disappointed do not establish oppressive action toward plaintiff by the controlling shareholders. The promise of employment was honored, the opportunity being lost to plaintiff through no fault of defendants. The parties' expectation that plaintiff would at some time participate in management was likewise thwarted by plaintiff's failure to satisfy the condition precedent to participation, i.e., that he learn the business.
Although it would seem too early in the life of this corporation to expect dividends, the facts on that issue are not in. Claims of plaintiff regarding irresponsible fiscal policies and management improprieties were deferred until the decisions contained in this opinion were made. The proof to be offered in these areas may establish a case of corporate mismanagement or of oppression, entitling plaintiff to relief.[2]
NOTES
[1] This conclusion may well be immaterial. Any future suit brought to collect the $20,000 probably would be barred by the single controversy doctrine. The Malaker Corporation v. First Jersey Nat'l Bk., 163 N.J. Super. 463, 496 (App. Div. 1978).
[2] One point in that connection should be mentioned: plaintiff and the other 20% shareholders, when compared with Skordas, a 40% shareholder, contributed a disproportionate amount of money to the corporation for improvements. If there is no explanation for that circumstance in the testimony to be presented, some adjustment may be necessary.