261 N.J. Super. 63 (1992)
617 A.2d 1225
JUDITH R. BRENNER, PLAINTIFF-APPELLANT,
v.
HOWARD BERKOWITZ, RUTH BERKOWITZ AND ARBEE ASSOCIATES, INC., A NEW JERSEY CORPORATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 2, 1992.
Decided December 14, 1992.
*65 Before Judges J.H. COLEMAN, SHEBELL and CONLEY.[1]
Martin J. Brenner argued the cause for appellant (Brenner & Brenner, attorneys).
Jonathan L. Goldstein and Richard K. Coplon argued the cause for respondents (Hellring, Lindeman, Goldstein & Siegal, attorneys; Mr. Goldstein, Mr. Coplon and Judah I. Elstein, of counsel and on the brief).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
This is an appeal by a minority shareholder in a closely held corporation from a judgment denying her requests to buy out the majority, to have the defendants purchase her minority interest, or in the alternative, for involuntary dissolution of the corporation pursuant to N.J.S.A. 14A:12-7(1)(c) and 7(8). We reverse and remand.

I
In 1973, plaintiff's father Irving Resnick formed defendant Arbee Associates, Inc., a New Jersey corporation, to operate an *66 office furniture business. One hundred shares of the corporate stock were distributed: 35 shares to plaintiff Judith R. Brenner, Resnick's daughter, 36 shares to plaintiff's sister Ruth Berkowitz, 19 shares to Ruth's husband Howard Berkowitz (Berkowitz), and 10 shares to Resnick. The minutes of the first shareholders meeting, held on June 1, 1973, reveal that all shareholders were appointed as directors and Berkowitz was named president, and his consent was required for any action taken by the board. Berkowitz was given complete managerial and supervisory responsibility for the company. A quorum consisted of Berkowitz plus any other one member of the board. As might be expected, shareholder dealings were informal. Apparently, no formal meeting of the board or shareholders was held between 1981 and 1984.
Resnick became ill in October 1984 and died on December 10, 1984. Upon his death, his 10 shares were distributed evenly between his two daughters, thereby vesting 60% interest in Howard and Ruth Berkowitz. After the death of Resnick, the relationship between plaintiff's family and the Berkowitz family declined. Plaintiff's son and future daughter-in-law who had been employed in the business, were terminated in September 1987. Soon thereafter, plaintiff instituted the present litigation.
On November 14, 1987, plaintiff filed a verified complaint alleging that defendants Howard and Ruth Berkowitz as directors and officers of Arbee, "have mismanaged Arbee, abused their authority as officers and directors of Arbee and acted illegally, oppressively and unfairly toward plaintiff" as a minority shareholder of Arbee in violation of N.J.S.A. 14A:12-7(1)(c). She sought "appointment of a custodian and the eventual dissolution of Arbee." The specific misconduct alleged in the complaint consists of: (1) the unauthorized $560,000 salary of Berkowitz, (2) the denial of plaintiff's request to have her attorney present at a board of directors meeting scheduled for November 3, 1987, (3) precluding plaintiff from "participating in the decision making process and operation of Arbee," and (4) *67 the failure of defendants to "provide plaintiff with any other effective notice of the affairs of Arbee."
Plaintiff was permitted on September 15, 1989, to file an amended complaint. In it she repeated the allegations contained in the complaint and the following additional allegations were made: that Berkowitz (1) committed fraud against Arbee and one of its "franchisors," Steelcase, (2) illegally misappropriated proceeds from cash sales to employees, (3) illegally failed to pay sales taxes to the State of New Jersey on cash sales to employees, (4) failed to pay proper taxes on temporary workers, and (5) misrepresented some of Arbee's nonunion employees as union workers. Plaintiff sought appointment of a custodian, an order permitting plaintiff to purchase the stock of Howard Berkowitz and Ruth Berkowitz, an order permitting the corporation or Howard and Ruth Berkowitz to purchase her stock, dissolution of the corporation and payment of plaintiff's attorney's fees and expert fees. Shortly after plaintiff was permitted to file the amended complaint, she was removed from the board in December 1989.
A bench trial was conducted on diverse dates between August 6, 1990 and January 8, 1991. The judge issued a formal opinion on May 20, 1991, in which he found that plaintiff established there were five instances of mismanagement, oppression, fraud and/or illegality committed by defendants, particularly Howard Berkowitz. The judge concluded that even though defendants had engaged in fraudulent, illegal and oppressive conduct, plaintiff was not entitled to any relief under N.J.S.A. 14A:12-7(1)(c) because the statute was meant to remedy only "ongoing oppression, fraud or illegality" and all of such acts had ceased before the court issued its opinion. Nevertheless, the court found that plaintiff's removal from the board was oppressive and constituted unfair treatment because both the plaintiff and her father expected her to remain on the board. The judge ordered her reinstated as a board member. Finally, the judge enjoined Berkowitz from engaging in further misconduct in violation of his fiduciary duty.

*68 II

A.
Based on the evidence, the judge found that the following five instances of misconduct occurred. The first dealt with improper use of pricing discounts. Approximately 70-85% of Arbee's business came from selling Steelcase office products as a franchisee. Steelcase had certain national accounts, among them was Prudential, which were entitled to receive preferential pricing. Such special pricing allows Arbee to remain competitive in the bidding process. Prudential received an 18% discount; by contrast, the United Nations was the beneficiary of no such preferential pricing. Up to 1985, Arbee had not been very successful in obtaining business from the United Nations. Finally, on May 17, 1985, Arbee received a purchase order for $206,000 in equipment from the United Nations. The purchase order requested delivery of the merchandise in three stages. On May 24, 1985, Arbee sent a purchase order to Steelcase for the first part of the order. The misconduct occurred when Arbee identified the customer as Prudential when placing the order with Steelcase and requested the 18% discount. A similar pattern was repeated when processing the second and third stages of the purchase orders of June 28 and August 14, 1985.
Arbee received the preferential pricing, but the United Nation's paid for its order at the un-discounted price. Berkowitz said he detected the mistake by September 1985, but the matter went unrectified until he received a request from plaintiff's attorney after suit was instituted in November 1987 regarding the United Nations' documents. At that point, Berkowitz agreed to return the discount to Steelcase in the form of a debit to Arbee's account.
The second instance of misconduct involved Arbee's failure to pay sales taxes on employee sales and Berkowitz's use of the unreported cash received from those sales. Employees were permitted to buy furniture at wholesale prices free of sales *69 taxes. Certain non-employees were also afforded the same perk. These transactions were never recorded on Arbee's books as income; instead, they were treated as a cost of sales. While Resnick was alive and active in the business, he received the cash from the employees. In his absence and after he became ill, Berkowitz received the money. Berkowitz would place the money, the amounts of which he never tabulated, in a locked file to which only he and Resnick had keys. After Resnick's death Berkowitz was in full control of the unreported cash. He used the money for what he termed "business expenses." He would pay cash for certain items and then reimburse himself, which was not consistent with the reporting procedures he required of his employees.
In May 1985, five months after Resnick's death, the company controller, Marguerita McCabe, became uncomfortable with the practice because she could not track the sales. (The failure to pay sales taxes or to report the sales as income was proscribed by N.J.S.A. 54:52-8 to N.J.S.A. 54:52-14, and are designated as crimes.) A new account was set up to monitor employee sales. From May 1985 until May 1986, employee sales were recorded in what was called an "E" account. However, no change was made in the practice of giving the cash to Berkowitz to use as he chose, and no sales tax was paid. In the spring of 1986, the "E" account officially ended; employee purchases were theoretically to be placed into the "A" account, with sales tax generally being paid. Although the changeover was made to allow payment of sales taxes, the practice of not charging sales tax on employee purchases persisted until well into 1987.
In January 1990, well after institution of this law suit, Berkowitz sent the State a check for approximately $2,300. This amount was to cover sales tax on employee sales for the period from the second quarter of 1985 through the fourth quarter of 1987. As a result of the litigation, Berkowitz calculated how much money was received by the company during the time the "E" account was active. For that 13 month period, from May 1985 through May 1986, $65,975.15 was *70 received for employee purchases. After accounting for his personal purchases, for which he ultimately paid, the amount was about $46,000. About $19,000 of this was paid to Arbee by Berkowitz which was apparently reported as income, leaving a cash amount of approximately $27,000 that required a reckoning. Berkowitz reimbursed the company $7,550. He estimated that the balance of $11,450 went for business expenses, his ski house in Vermont and his country club membership which he used for entertainment. Plaintiff contended that Berkowitz stole much more and that 40% of the net amount stolen belonged to her. The judge found this was a misapplication of entrusted property. See N.J.S.A. 2C:21-15.
The third area of misconduct involved the payments made for temporary help. Between 1983 and January 1987, Arbee paid temporary workers $223,832.80 in green checks, as distinguished from regular payroll checks, without deducting FICA or other taxes and without issuing 1099s to those temporary workers paid with green checks who exceeded the $600 earnings threshold in a given year. Berkowitz personally signed these checks. Even though this practice was discontinued in January 1987 before this litigation was initiated, no evidence was presented at trial indicating that any attempts had been made to pay the FICA or other taxes that might be owed the State or federal governments.
The fourth area of misconduct dealt with misrepresentation with respect to the "union status of some of Arbee's employees." Some of Arbee's jobs were in unionized companies and required union personnel. Arbee is basically a nonunion shop except for its installers. From time-to-time, a nonunion employee of Arbee would present himself on a job which required union workers and present the union book of another, unionized Arbee employee, thus representing himself to be a union member. Arbee would pay into the union's welfare and pension fund, but in the name of the book holder who was a member of the union. Berkowitz was aware of the practice, *71 but he did not put an end to it until after the present litigation was instituted.
The fifth incident found to be improper was the discharge of plaintiff from the board of directors. When the judge declined to enjoin a scheduled special meeting of the board, the meeting was held in December 1989, and plaintiff was removed from the board. The judge found this conduct was oppressive to the plaintiff.

B.
The judge rejected plaintiff's assertion that payment of a salary to Berkowitz in excess of the $350,000 approved by the board on June 1, 1981 was oppressive to her. The judge noted that the salary agreement permitted the payment of a higher salary "as may be determined from time to time by the Board of Directors." Although there was no formal resolution raising his salary to the $474,206 paid in 1989, the judge noted Arbee's sales had virtually quadrupled (from $11,500,000 to $46,000,000) between 1981 and 1989 and that Berkowitz had substantial responsibilities for the company. He found that in the circumstances, a higher salary was expected, and therefore it was not oppressive to plaintiff.
Similarly, the judge rejected plaintiff's contention that termination of her son and daughter-in-law was oppressive to her. The judge concluded that their departure from Arbee was not inherently oppressive. He reasoned that without proof to show an intent to oppress the plaintiff, there was no basis to grant any relief to plaintiff.
To recapitulate, the judge found that there were at least five episodes of oppression, fraud or illegality. These instances were: the fraud and illegality associated with the misapplication of Prudential's preferential pricing to the United Nations' order; the failure to pay sales taxes and the failure to include the sales proceeds as income; the misapplication of entrusted funds by Berkowitz as a fiduciary of Arbee, the failure to place *72 short term or temporary employees properly on the payroll; and the misrepresentation as to union membership.

C.
Final judgment was entered on May 31, 1991. The judge held that "since the above mentioned bases for oppression have ceased, this court cannot award statutory relief." However, his final order provided that (1) plaintiff be restored to the Board of Directors of Arbee Associates, Inc., (2) Howard Berkowitz "is enjoined from repetition of any of the cited acts of mismanagement which occurred in the past that are in breach of his fiduciary duty," and (3) the complaint in all other respects be dismissed.

III
Plaintiff contends that the trial judge erred in finding that although defendants committed acts the judge found to be "fraudulent or illegal" and "oppressive," she was not entitled to any relief under N.J.S.A. 14A:12-7(1)(c). The judge concluded that notwithstanding his findings of mismanagement, fraud and illegality, plaintiff still had to prove that she was oppressed, which the judge found did not exist except for her removal from the board.
N.J.S.A. 14A:12-7(1)(c), in pertinent part, provides:
The Superior Court, in an action brought under this section, may appoint a custodian, appoint a provisional director, order a sale of the corporation's stock as provided below, or enter a judgment dissolving the corporation, upon proof that
* * * * * * * *
(c) In the case of a corporation having 25 or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.
The present language in N.J.S.A. 14A:12-7(1)(c) was added by L. 1973, c. 366, § 67 effective May 1, 1974, referred to as the *73 1972 amendments. Prior to the 1972 amendments, the only statutory remedy provided minority shareholders was dissolution of the corporation when the corporation was deadlocked. The harshness of dissolution as the sole remedy prompted change. In Berger v. Berger, 249 N.J. Super. 305, 315, 592 A.2d 321 (Ch.Div. 1991), the court observed that like the language added to the statute with the 1972 amendments, the Final Report of the Corporation Law Revision Commission, State of New Jersey (1972) (Commissioners comments)[2] illustrates the focus of the statute to be that of remedying abuse and oppression by those in control of a closely held corporation (directors, majority shareholders and management) against minority shareholders. The court in Berger concluded that the purpose of the 1972 amendments to N.J.S.A. 14A:12-7(1)(c) was to prevent and to provide a remedy for abuse and oppression by the majority shareholders.
The Commissioners' comments with regard to the 1972 amendments provide further that N.J.S.A. 14A:12-7(1)(c) was substantially revised to enlarge the grounds on which an action may be brought and to provide additional remedies. The comments state that this section was amended by adding as a ground for action in the case of closely held corporations, a showing of misconduct or oppressive behavior by those in control and by adding alternative remedies to dissolution, such as appointment of a provisional director, or custodian, and a judicially ordered sale of stock.
Plaintiff argues that she was entitled to relief based on the judge's finding that she established fraud and illegality on the part of Berkowitz. We agree that plaintiff established grounds for relief under N.J.S.A. 14A:12-7(1)(c).
Notwithstanding the Legislature's use of the disjunctive in N.J.S.A. 14A:12-7(1)(c) when referring to proof that the "directors or those in control have acted fraudulently or illegally, *74 mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders ...," the trial judge interpreted the statute as if the Legislature had used the conjunctive. He interpreted the statute to mean that even when a minority shareholder proves fraud and/or illegality, that shareholder must also prove that an officer or director acted "oppressively."
The judge relied upon the definition of oppression articulated in Exadaktilos v. Cinnaminson Realty Co., Inc., 167 N.J. Super. 141, 400 A.2d 554 (Law Div. 1979), aff'd o.b., 173 N.J. Super. 559, 414 A.2d 994 (App.Div.), certif. denied, 85 N.J. 112, 425 A.2d 273 (1980). He concluded that oppression requires a court to determine the parties' reasonable expectations and understanding of their respective corporate roles and then decide "whether the controlling shareholders have acted in a fashion that is contrary to this understanding ... toward one or more minority shareholders." We have no disagreement with the judge applying the definition of oppression articulated in Exadaktilos to plaintiff's claim respecting Berkowitz's salary and the termination of employment claims.
In this case, the problem arises from the trial judge's failure to recognize that oppression is not the only ground for relief to a minority shareholder under N.J.S.A. 14A:12-7(1)(c). The judge mistakenly relied upon Gershaw v. Ther-A-Pedic Sleep Prod., 218 N.J. Super. 350, 527 A.2d 923 (App.Div. 1987); Hughes v. Sego Int'l Ltd., 192 N.J. Super. 60, 469 A.2d 74 (App.Div. 1983); and Berger v. Berger, supra, to support his thesis that oppression must be found in addition to fraud and/or illegality.
Significantly, neither Gershaw, Hughes nor Berger dealt with fraud or illegality by anyone. Exadaktilos and Hughes dealt with termination of employment due to poor performance. Berger dealt with removal of a corporate officer, and Gershaw dealt with inspection of corporate records, which clearly did not *75 implicate N.J.S.A. 14A:12-7(1)(c) at all. Neither of these cases suggests that a claim for relief based on fraud or illegality under N.J.S.A. 14A:12-7(1)(c) also requires proof of oppression.
The language employed in the 1972 amendments shows that the use of the disjunctive was meant to enumerate additional separate causes of action, independent of oppression. The Commissioner's comments bear this out by stating that N.J.S.A. 14A:12-7(1)(c) was revised to enlarge the grounds on which an action may be brought. The new grounds added involve misconduct, such as fraud and illegality, and oppression was added as a cause of action as well.
Because the Legislature used the disjunctive in subsection 7(1)(c) and the Commissioners have stated that new additional grounds for relief were added, we are convinced that "illegality" and "fraud" as used in the statute are not meant to be synonymous with "oppression." We believe the Legislature has directed that when a minority shareholder establishes fraud or illegality by "the directors or those in control" of a closely held corporation, such a minority shareholder has established a per se cause of action under the statute. Such a plaintiff is not also required to establish oppression. We are entirely satisfied that our interpretation comports with the legislative intent. In re N.J. Medical Malpractice, 246 N.J. Super. 109, 128, 586 A.2d 1317 (App.Div. 1991); Coalition of Concerned Nurses v. N.J. Dept. of Higher Edu., 243 N.J. Super. 65, 68, 578 A.2d 882 (App.Div. 1990).
To be sure, even if the statute did require proof of oppression as well, it would be difficult indeed to imagine a minority shareholder who did not reasonably expect the officers and majority shareholders to refrain from engaging in illegal or fraudulent conduct given the public policy of this State and the longstanding fiduciary obligation a corporate officer owes to the shareholders. Here, the judge found that Berkowitz misapplied sales proceeds which represented "a breach of his fiduciary duty" and that he defrauded Steelcase respecting the United *76 Nations' purchase and the union as well. The judge also found that Berkowitz misapplied cash he received in his fiduciary capacity, a potential violation of N.J.S.A. 2C:21-15. It seems reasonable for any shareholder to expect officers to comply with the law which furthers the public policy of this State, see Potter v. Village Bank of New Jersey, 225 N.J. Super. 547, 557-558, 543 A.2d 80 (App.Div.), certif. denied, 113 N.J. 352, 550 A.2d 462 (1988), and to avoid defrauding labor unions, which is also contrary to legislatively established public policy. Indeed, willful abuse by an officer, which involves a breach of trust, has been recognized as a basis for dissolving a corporation even before the 1972 amendments. See In re Collins-Doan Co., 3 N.J. 382, 393-394, 70 A.2d 159 (1949). Similarly, prior to 1972, "gross or fraudulent mismanagement by corporate officers or gross abuse of trust" have constituted grounds for dissolution of the corporation or a less onerous remedy where possible. Roach v. Margulies, 42 N.J. Super. 243, 245-246, 126 A.2d 45 (App.Div. 1956).

IV
Plaintiff argues further that she should not have been precluded from obtaining relief under N.J.S.A. 14A:12-7(1)(c) simply because all of the illegal and fraudulent conduct had ceased before the judge rendered his decision on May 20, 1991. We agree. As noted above, proof of fraud or illegality establishes a per se cause of action. The statute provides that the Superior Court may afford certain remedies to a minority shareholder "upon proof that ... the directors or those in control have acted fraudulently or illegally...." N.J.S.A. 14A:12-7(1)(c). The Legislature chose to use the past tense of the verb rather than the present tense "are acting" as required by the judge. Words used by the Legislature must be given their regular and ordinary meaning. In addition, the primary consideration in construing a statute is its plain language. Kimmelman v. Henkels & McCoy, 108 N.J. 123, 128, 527 A.2d 1368 (1987). Here, the Legislature used the simple verb "have *77 acted" which has the ordinary meaning here of referring to past conduct.
Furthermore, the policy a statute is intended to implement must also be considered when determining legislative intent. New Jersey Prop.-Liab. Ins. Guar. Ass'n v. Sheeran, 137 N.J. Super. 345, 351, 349 A.2d 92 (App.Div. 1975), certif. denied, 70 N.J. 143, 358 A.2d 190 (1976). The court's requirement that the illegal or fraudulent conduct be ongoing makes the statutory purpose illusory. We are enjoined to avoid any unreasonable construction of a statute. See Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 521, 472 A.2d 517 (1984). The Commissioners have stated that the purpose of the statute is to prevent abuse of the minority by the majority, to end dissention among them and to provide a remedy short of dissolution. See also Berger v. Berger, supra, 249 N.J. Super. at 316, 592 A.2d 321; Exadaktilos, supra, 167 N.J. Super. at 152, 400 A.2d 554. A requirement that the fraudulent conduct must be ongoing frustrates this stated purpose because it allows the majority to abuse the minority as long as the abuse ceases prior to the date a decision is rendered in the legal action complaining of such abuse. Therefore, based on the regular and ordinary meaning of the verb "have acted," and because a contrary construction would unreasonably frustrate the stated purpose of the statute, we hold that N.J.S.A. 14A:12-7(1)(c) covers both completed and ongoing illegal, fraudulent and oppressive conduct.
Based on the evidence presented and the factual findings made by the judge, which defendants do not contest in this appeal, plaintiff is powerless in the corporation and needs protection. Until the defendants decided to change their fraudulent and illegal practices, most of which occurred or continued after this litigation was instituted, plaintiff as a minority shareholder and the corporation too, for that matter, were at risk from several sources: from Steelcase, which might decide to cancel its unwritten dealership agreement with Arbee if it *78 learned of the fraud and deception; from State and Federal taxing authorities if an audit uncovered the unreported income and the unpaid sales tax; and from the union, which could ban Arbee from union jobs. In short, defendants' fraudulent and illegal actions exposed plaintiff to a very real, although ultimately unrealized, potential for a significant diminution in the value of her minority share.
Beyond that, as noted earlier, the Commissioners have commented that in drafting N.J.S.A. 14A:12-7, the Legislature felt that the courts should be free to look beyond the "direct harm" to a minority shareholder's investment and "to consider all pertinent factors." N.J.S.A. 14A:12-7, Commissioners' Comment  1972 Amendment. This means that the court should both consider the potential risk to a minority shareholder based on any pattern of prohibited conduct that may develop and the resources a minority shareholder has to cope with potential abuses.
In addition, it must be remembered that a minority shareholder in a closely held corporation is in a highly vulnerable position. Orchard v. Covelli, 590 F. Supp. 1548, 1557 (W.D.Pa. 1984), dismissed, 791 F.2d 920 (3d Cir.1986). Orchard articulates several reasons for the vulnerability. First, based upon its voting power, "the majority is able to dictate to the minority the manner in which the corporation is run." Ibid. Second, a minority interest in a closely held corporation is difficult to value because the shares are not publicly traded and a fair market is often not available. Dissention within a closely held corporation makes the minority interest less desirable. For this reason, a minority shareholder who wishes to challenge the majority finds himself or herself in a catch 22 situation. It is not profitable to leave, and it is not safe to stay with the corporation. "In reality, the only prospective buyer turns out to be the majority shareholder." Ibid. Because the market for the sale of a minority interest is so limited, that makes the minority particularly vulnerable to manipulation and oppression. The third factor is that the stock in a closely held *79 corporation is frequently owned by friends and/or family members. Ibid. Such is the case here. Once the personal relationship between shareholders is destroyed, as has occurred here, the viability of the business entity generally tends to deteriorate. These are some of the important reasons why the law imposes a fiduciary duty upon the majority and the officers requiring them to act with the utmost good faith and loyalty in transacting corporate business. Ibid.
Under the trial court's interpretation, the potential for abuse is substantial indeed. A corporate officer who is part of the majority can repeatedly require a minority shareholder to spend his or her money taking the majority to court only to have the majority suspend the offensive conduct  until the next time. This, in our view, would be a most unreasonable construction of a plainly worded statute.

V
Finally, we must address what remedy plaintiff is entitled to receive. Plaintiff contends that after the judge found she had established fraud, illegality and mismanagement by Berkowitz, she should have been granted a remedy provided in N.J.S.A. 14A:12-7(1). The remedy she sought was to buy out the majority shareholders, to have the majority or the corporation purchase her stock or a dissolution of the corporation. The judge observed in his letter opinion that the court had "no authority to order a buy-out under this statute in the absence of an appropriate motion. Since no party to this litigation has moved to buy-out the plaintiff, this court cannot afford this relief." Thereafter, plaintiff filed a motion for reconsideration and at that time included a motion to have the defendants buy out her 40% interest in the corporation. That motion was denied also.
We agree with the judge that under N.J.S.A. 14A:12-7(8), the motion must be made by a party to the litigation to buy the shares of another party to the litigation. We disagree, however, *80 with the judge's statement that the court had no authority to order a buy-out. During a pretrial settlement conference, it was agreed that if the court found a basis for affording plaintiff relief under the statute, after that determination was made, defendants would then file a motion to buy out plaintiff. We see no reason why a similar procedure cannot be followed in a litigated case, especially when the majority does not wish to have the corporation dissolved. In the alternative, plaintiff can be directed to file a motion to purchase the shares held by the majority, a demand made by plaintiff in her amended complaint. Moreover, a judge sitting in equity has no limit on his or her flexibility in devising a variety of remedies and shaping them to fit the circumstances of a particular case. A lack of precedent, or mere novelty in incident should not be an obstacle. Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403, 411, 1 A.2d 425 (E. & A. 1938).
The procedure followed in Hughes v. Sego Int'l Ltd., supra, 192 N.J. Super. at 65, 469 A.2d 74 is also instructive. There, we held that discharge of a minority shareholder from employment constituted oppressive conduct. No buy-out motion had been filed prior to the adjudication of liability. That left dissolution as the only remedy before the court. The judgment ordered dissolution unless the majority shareholders purchased the plaintiff's stock. We noted that "[O]bviously in response to this decision defendants moved to buy out plaintiff's stock pursuant to N.J.S.A. 14A:12-7(8)." The defendants made the motion which was granted. Ibid. The same procedure may be followed in this case.
Here, plaintiff filed a motion for reconsideration and a motion seeking to have either the corporation or the individual defendants purchase her stock pursuant to N.J.S.A. 14A:12-7(8) as amended by L. 1988, c. 94, § 60, effective December 1, 1988. This is part of the same relief requested in the amended complaint. In view of our holding that plaintiff established more than one of the grounds for relief specified in N.J.S.A. 14A:12-7(1)(c), and the fact that plaintiff wanted to sell her *81 shares or to buy the majority's shares and defendants do not wish to have the corporation dissolved, the judge could have directed defendants to file a motion pursuant to N.J.S.A. 14A:12-7(8) seeking to purchase plaintiff's shares to avoid possible dissolution of the corporation.
We have determined not to decide the counsel fee issue raised by plaintiff in light of our decision. We have also considered the remaining contentions raised by the plaintiff and find they are clearly without merit and no further comment is required. R. 2:11-3(e)(1)(A) and (E).
We find that plaintiff sustained her burden of proving a cause of action under N.J.S.A. 14A:12-7(1)(c). We reverse that portion of the final judgment which dismissed the complaint with prejudice and without costs or counsel fees. We remand the matter to the Chancery Division to entertain a motion from either party for a buy out. While N.J.S.A. 14A:12-7(8) gives the judge discretion whether to order a buy out and to fix the terms and conditions of the sale, it will indeed be difficult not to order a buy-out given the compelling record in this case which persuaded the judge to find fraud, illegality, mismanagement and breach of fiduciary duty. On the remand, the judge is directed to reconsider the issue of counsel fees as well. On that score, we observe that where an officer who is a party to the litigation has engaged in fraud, illegality, mismanagement and breach of fiduciary duty, there has been a strong showing that he or she has acted arbitrarily and not in good faith within the contemplation of N.J.S.A. 14A:12-7(10). Unlike N.J.S.A. 2A:15-59.1, the language contained in N.J.S.A. 14A:12-7(10) makes it much more than a frivolous litigation statute.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] Judge Conley did not hear the oral argument, but the attorneys have consented to her participation in the decision.
[2] N.J.S.A. 14A:12-7, Commissioners Comment  1972 and 1988 amendments.