SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Manahawkin Convalescent v. Frances O'Neill (A-17-12) (071033)**

**Argued October 22, 2013 -- Decided March 11, 2014**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court considers whether a contract between a nursing home and the daughter of one of its residents violated the Nursing Home Act (NHA), N.J.S.A. 30:13-1 to -17, which bars certain nursing homes from requiring third parties to guarantee payment as a condition of admitting or retaining a patient.  The Court also considers the contract's validity under the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20, and the Truth-in-Consumer Contract, Warranty, and Notice Act (TCCWNA), N.J.S.A. 56:12-14 to -18.

In 2007, Elise Hopkins was admitted to Manahawkin Convalescent Center (Manahawkin), a Medicaid and Medicare certified nursing home.  Hopkins' daughter, Frances O'Neill elected not to assign Hopkins' Social Security payments directly to Manahawkin, instead withdrawing the funds from Hopkins' bank account to pay her bills.  O'Neill signed Manahawkin's "Rehabilitation and Nursing Home Admission Agreement" (Admission Agreement), which named her as the "Responsible Party" for purposes of paying her mother's  bills.  Since Hopkins' expenses were not privately funded, O'Neill did not sign the Private Pay Guarantor portion of the Admission Agreement, which required Responsible Parties to guarantee payment of resident costs.  O'Neill also received the "Resident's Bill of Rights," which stated that she was not required to guarantee payment from her own assets as a condition of her mother's admission to, or retention in, the facility.

Following Hopkins' death in 2008, and O'Neill's appointment as executrix of the estate, a dispute arose between O'Neill and Manahawkin regarding an unpaid balance of $878.20.  In March 2009, O'Neill received a letter from Manahawkin's Collection Department stating that she, as the Responsible Party, had "the obligation to pay any debts owed by [Hopkins] to the facility."  The letter explained that failure to pay would result in legal action against O'Neill.  In April 2009, Manahawkin filed a complaint in which O'Neill was named as the sole defendant.  O'Neill asserted a counterclaim/third party complaint, claiming that the Admission Agreement violated the NHA, CFA, and TCCWNA.  In September 2009, Manahawkin abandoned its efforts to claim the balance on Hopkins' account, and its complaint was dismissed with prejudice.

In April 2011, O'Neill reasserted  her NHA, CFA, and TCCWNA claims against several third-party defendants.  The parties cross-moved for summary judgment, which was granted in defendants' favor.  The trial court concluded that the Admission Agreement did not compel a Responsible Party to assume personal liability for a Medicaid patient's contractual obligation.  It pointed out that O'Neill did not sign the Private Pay Guarantor section and had received the Resident's Bill of Rights, which explicitly disclaimed any third party guarantee.  The court also found that both the collection letter and the complaint, although poorly drafted, sought to compel O'Neill to pay the balance from her mother's funds.  The court held that the NHA and the Admission Agreement constrained Manahawkin from seeking to collect O'Neill's personal assets as payment for her mother's care.

O'Neill appealed, and the Appellate Division panel affirmed.  Manahawkin Convalescent v. O'Neill, 426 N.J. Super. 143 (App. Div. 2012).  The panel noted that federal and state law barred Manahawkin from legally requiring O'Neill to use her personal assets to satisfy her mother's debts, and concurred that Manahawkin had neither expressly nor implicitly violated the NHA. The panel also found that Manahawkin had not violated the CFA since it had used lawful means to seek payment from O'Neill as the Responsible Party.  Although not raised by any party, the panel concluded that nursing homes are exempted from the CFA by virtue of the learned professional exception to the statute.  This Court granted O'Neill's petition for certification.  212 N.J. 430 (2012).

**HELD:** Because Manahawkin's Admission Agreement imposed no requirements on O'Neill that contravened the NHA, and neither the Admission Agreement nor Manahawkin's collection complaint gave rise to a cause of action

under the CFA or the TCCWNA, dismissal of O'Neill's claims was proper. However, nursing homes and their counsel should ensure that each party's rights and remedies are clearly reflected in contracts and communications between facilities and individuals who arrange payment on a resident's behalf.

1. The Court reviews the trials court's summary judgment decision de novo, considering whether the evidence, when viewed in the light most favorable to the non-moving party, is sufficient to permit a rational factfinder to find in favor of the non-moving party. The trial court's factual findings are accorded substantial deference, while legal conclusions are not. Appellate review of a trial court's interpretation of a contract is de novo. (pp. 16-18)

2. The NHA complements the federal Nursing Home Reform Act, which, under 42 U.S.C.A. § 1396r(c)(5)(A)(ii), prohibits the requirement of third party guarantees of payment as a condition of admission to, or retention in, a nursing facility. In 1997, the NHA was amended to add similar language under N.J.S.A. 30:13-3.1. O'Neill's NHA claim is premised on three alleged violations: (1) the Admission Agreement required that she spend her personal funds to pay her mother's bills; (2) Manahawkin's collection letter constituted an attempt to coerce her into using her own assets to pay the final bill; and (3) Manahawkin's complaint improperly sought a remedy against O'Neill in her individual capacity. Reviewing the Admission Agreement as a whole, and considering the parties' intent, the contract's terms and purpose, and the surrounding circumstances, the Court concludes that it did not contravene federal law or the NHA. The Admission Agreement complied with the NHA by limiting O'Neill's obligation to the payment of Hopkins' bills with Hopkins' assets. Similarly, although Manahawkin's collection letter was inartfully drafted, it did not purport to assert rights beyond those authorized by the NHA. The complaint, although lacking in detail and improperly pled, also did not violate the NHA since did not allege that O'Neill was required to use her personal funds to pay Hopkins' bills. Accordingly, the dismissal of O'Neill's NHA claim was proper. (pp. 18-25)

3. The broadly-applied CFA was intended to greatly expand protections for New Jersey consumers by combating deceptive and fraudulent practices. A CFA claim requires proof of three elements: (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the loss. Conduct constituting an unlawful practice under the CFA requires deceptive, fraudulent or other similar selling or advertising practices. In certain circumstances, an agreement containing an unlawful term may satisfy this element. O'Neill predicated her CFA claim on Manahawkin's alleged violation of the NHA, as well as its alleged violation of the TCCWNA, which also is premised upon violation of the NHA. Since O'Neill's CFA claim was tethered to her NHA claim, she cannot prove unlawful conduct. Thus, the claim was properly dismissed, and the Court need not reach the issues of whether Manahawkin's conduct was exempt from the CFA under the "learned professional" exception or whether O'Neill suffered an ascertainable loss. (pp. 25-31)

4. The TCCWNA was enacted to prevent deceptive practices in consumer contracts by prohibiting the use of illegal terms or warranties. Like her CFA claim, O'Neill's TCCWNA claim is predicated upon an alleged violation of the NHA's prohibition on Medicaid or Medicare certified nursing homes requiring third party guarantees of payment as a condition of admission or retention. Although the trial court improperly failed to specifically address O'Neill's TCCWNA claim in its ruling, its determination that the Admission Agreement did not violate the NHA also resolved the TCCWNA claim. The Appellate Division's subsequent dismissal of the TCCWNA claim was consistent with Rule 1:7-4. (pp. 31-33)

5. Although Manahawkin did not violate the NHA, CFA or TCCWNA, its Admission Agreement, collection letter and complaint all failed to adequately set forth the respective rights and duties of the parties. Thus, the Court urges counsel for the nursing home industry to ensure that contracts are prepared, and collection practices are conducted, in a manner that fosters a clear understanding of each party's rights and remedies under the law. (pp. 33-35)

The judgment of the Appellate Division is **AFFIRMED**.

**CHIEF JUSTICE RABNER, JUSTICES LaVECCHIA and ALBIN, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE PATTERSON's opinion.**

MANAHAWKIN CONVALESCENT,

    Plaintiff,

       v.

FRANCES O'NEILL,

    Defendant,

       and

FRANCES O'NEILL in her
capacity as Executrix of the
Estate of ELISE HOPKINS,

    Third-Party Plaintiff-
    Appellant,

       v.

BROADWAY HEALTH CARE
MANAGEMENT, LLC;
M&A/COMPREHENSIVE HEALTH CARE
MANAGEMENT SYSTEMS, LLC; M.R.
OF MANAHAWKIN, LLC; and H.W.
OF MANAHAWKIN, LLC d/b/a
MANAHAWKIN CONVALESCENT
CENTER,

    Third-Party Defendants-
    Respondents.


       Argued October 22, 2013 – Decided March 11, 2014

       On certification to the Superior Court,
       Appellate Division, whose opinion is
       reported at 426 <u>N.J. Super.</u> 143 (2012).

Sander D. Friedman argued the cause for appellant (Law Office of Sander D. Friedman, attorney; Mr. Friedman and Wesley G. Hanna, II, on the briefs).

Walter F. Kawalec, III, argued the cause for respondents (Marshall, Dennehey, Warner, Coleman & Goggin, attorneys; Tracy L. Burnley, on the briefs).

David G. McMillin argued the cause for amicus curiae Legal Services of New Jersey (Melville D. Miller, Jr., President, attorney; Mr. McMillin, Mr. Miller, and Gwen E. Orlowski, on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

This appeal concerns a dispute between a nursing home and the daughter of one of its residents, arising from the nursing home's attempt to collect a claimed unpaid balance following the resident's death. The case requires the Court to determine whether the parties' contract, which imposed obligations on the daughter as a "Responsible Party," violated the Nursing Home Act (NHA), N.J.S.A. 30:13-1 to -17, which bars certain nursing homes from requiring third parties to guarantee payment as a condition of admitting or retaining a resident. The appeal also involves two consumer protection statutes: the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20, and the Truth-in-Consumer Contract, Warranty, and Notice Act (TCCWNA), N.J.S.A. 56:12-14 to -18.

When Frances O'Neill (O'Neill) arranged for her mother, Elise Hopkins (Hopkins), to become a resident of Manahawkin Convalescent Center (Manahawkin), she decided to pay

2

Manahawkin's bills from Hopkins' Social Security benefits, rather than arranging for those benefits to be directly paid to the facility. When her mother was admitted to the nursing home, O'Neill signed Manahawkin's "Rehabilitation and Nursing Home Admission Agreement" (Admission Agreement). The Admission Agreement designated O'Neill as the "Responsible Party" for purposes of processing her mother's bills, and set forth remedies in case of a default of that obligation. O'Neill did not sign a section of the Admission Agreement, applicable only to residents whose expenses were privately paid, which required Responsible Parties to guarantee payment of resident costs. She received a copy of a separate form that confirmed, consistent with the NHA, that Manahawkin could not require O'Neill to guarantee payment from her own assets as a condition of her mother's admission to the facility.

Following Hopkins' death, Manahawkin demanded in writing that O'Neill pay a balance due on her mother's account. It initially threatened, and then filed, a collection action against her. In a counterclaim, O'Neill asserted various causes of action, including claims based on the NHA, the CFA and the TCCWNA. After the parties stipulated to the dismissal of Manahawkin's collection action, resulting in no payment to Manahawkin, O'Neill reasserted her NHA, CFA and TCCWNA claims and sought class certification, which the trial court denied.

3

The trial court granted summary judgment dismissing O'Neill's claims and construing the Admission Agreement to impose no obligation on O'Neill to devote her personal funds to her mother's care. The trial court therefore deemed the Admission Agreement to conform to the NHA, and dismissed O'Neill's remaining claims. An Appellate Division panel affirmed, holding that the Admission Agreement met the requirements of the NHA, and that Manahawkin accordingly committed no unlawful act within the meaning of the CFA.

We affirm the Appellate Division's judgment. We concur with the trial court's finding that the Admission Agreement imposed no requirements on O'Neill that contravened the NHA. We hold that neither the Admission Agreement nor the collection complaint filed by Manahawkin gave rise to a cause of action under the CFA or the TCCWNA, and that the trial court properly granted summary judgment dismissing O'Neill's claims. We caution nursing homes and their counsel, however, that the NHA's constraints on the liability of a "Responsible Party" should be clearly reflected in contracts and communications between facilities and individuals who arrange payment on a resident's behalf.

## I.

On January 22, 2007, Hopkins was admitted to Manahawkin, a Medicaid and Medicare certified nursing home located in

4

Manahawkin, New Jersey.  Prior to Hopkins' admission, O'Neill obtained a durable power of attorney, and was managing Hopkins' bank account and other assets.  Rather than assign Hopkins' Social Security payments directly to Manahawkin, O'Neill elected to have those payments deposited in her mother's bank account.  She then used funds from that account to pay the nursing home's bills.

The Admission Agreement prepared by Manahawkin set forth the terms and conditions of O'Neill's residence at and treatment by Manahawkin, and provided that it was governed by New Jersey law.  The Admission Agreement identified O'Neill as the "Responsible Party," defined as "the person acting on behalf of the Resident as his or her representative and guardian in fact, or one who has been appointed by the Court as legal guardian." It described Manahawkin's responsibilities for Hopkins' care, including her diet, "lodging in a clean, healthful, properly outfitted sheltered environment," twenty-four hour nursing care, assistance with daily living, a supply of hospital gowns and bed linens, social services, activities and opportunities for religious practice.

The Admission Agreement also described O'Neill's duties as "Responsible Party," including the provision of personal clothing and effects, spending money and uninsured hospital costs, physician fees and medication costs.  O'Neill agreed to

5

"pay basic rates as agreed upon with [Manahawkin] at stated intervals," to "comply with all terms and conditions of this Agreement," and to "pay all costs, expenses and reasonable attorneys fees" for any collection action instituted by the nursing home for "sums due and owing by the Resident."

The Admission Agreement set forth the billing responsibilities of "Resident/Responsible Party" -- in this case, Hopkins and her daughter, O'Neill -- for the payment of the facility's bills:

> Resident/Responsible Party shall pay [Manahawkin's] bills within ten (10) days of receipt . . . . If no contact has been made by the Resident/Responsible Party in relation to paying these amounts within 15 days of receipt of the original bill, the process will begin to notify Resident/Responsible Party of intent to discharge due to nonpayment within 45 days. Should [Manahawkin] retain an attorney to enforce any provision of this Agreement, Resident/Responsible Party agrees to pay reasonable attorney's fees, collection costs and other costs of litigation. Resident and Responsible Party hereby agree to allow [Manahawkin] to place a lien on any owned properties in the event there is a financial obligation to [Manahawkin] that remains unpaid for a period of 60 days or more.

The Admission Agreement did not distinguish between the resident and the Responsible Party, and did not specify precisely whose "owned properties" could be the subject of a lien.

6

The Admission Agreement also included a section entitled "Private Pay Guarantor (if applicable)," with a separate signature line for a "Guarantor." That section provided:

> The undersigned hereby acknowledges and agrees to the undertakings of the Responsible Party as set forth hereinabove and further agrees to provide, from his/her own funds, and guarantees payment of all financial obligations of the Resident, including but not limited to the per diem rate and other charges incurred by the Resident, under this Agreement.

Consistent with her mother's status as a Medicaid-eligible resident rather than a "private payor" resident, the signature line for a "Guarantor" was not signed by O'Neill.

In the Admission Agreement, O'Neill acknowledged that she had received the "Resident's Bill of Rights" form. That form provided in relevant part:

> The facility must not require a third party guarantee of payment to the facility as a condition of admission, or expedited admission, or continued stay in the facility. However, the facility may require an individual who has legal access to a resident's income or resources available to pay for facility care to sign a contract, without incurring personal financial liability, to provide facility payment from the resident's income or resources.

The Admission Agreement was signed on the day of Hopkins' admission by a representative of Manahawkin and by O'Neill twice, first as "Representative" of her incapacitated mother, and second as "Responsible Party."

7

The record reveals no dispute between Manahawkin and O'Neill regarding billing for nursing home services during the seventeen months during which Hopkins lived at Manahawkin. Following Hopkins' death on June 13, 2008, O'Neill was named as executrix of her mother's estate.

Several months after Hopkins' death, a dispute arose between O'Neill and Manahawkin regarding a balance of $878.20 recorded on Hopkins' account. On March 26, 2009, David Goldberg, on behalf of Manahawkin's Collection Department, wrote a letter to O'Neill stating that the facility had advised the Collection Department that O'Neill was "the responsible party for [Hopkins], which means that you have the obligation to pay any debts owed by this resident to the facility." The letter advised O'Neill of the $878.20 balance "owed to the facility on this resident[']s account," and demanded a prompt response from O'Neill. Goldberg wrote that O'Neill's failure to contact Manahawkin to arrange payment "will leave us no choice but to proceed with legal action against you as the responsible party," and that Manahawkin would sue O'Neill "for the monies due with [accrued] interest plus court costs and legal fees." He added that O'Neill would be "reported to the credit rating agencies," and that his letter was the only notice that she would receive "prior to the commencement of legal proceedings."

Notwithstanding the letter, the contested balance remained unpaid.

## II.

On April 3, 2009, eight days after sending its collection letter, Manahawkin filed a complaint in the Special Civil Part of the Law Division (Special Civil Part). The complaint, signed by Goldberg as the facility's representative, named O'Neill as the sole defendant and did not assert a claim against Hopkins' estate. Manahawkin alleged:

> The [p]laintiff is Manahawkin Convalescent a nursing facility. The defendant is Frances O'Neill who was receiving money on behalf of another. Those monies were to be used for another in accordance with NJ Medicaid while at Manahawkin Convalescent. The defendant entered into an agreement [] with the plaintiff as responsible party . . . .
>
> The amount you, the plaintiff(s) are demanding from the defendant(s) $878.20 balance and $39.00 for court costs of suing.

O'Neill retained counsel and filed a responsive pleading. In her individual capacity, O'Neill denied Manahawkin's allegations, including the allegation of an outstanding balance on her mother's account, and contended that "[d]efendant does not personally guarantee the debts and liabilities of the resident." O'Neill also asserted a "counterclaim/third party complaint" in her fiduciary capacity as the executrix of Hopkins' estate, and on behalf of a putative class described as

9

herself and "all others similarly situated," against Manahawkin.[1] In her individual capacity, on behalf of Hopkins' estate and the putative class, O'Neill asserted various statutory and common law claims, including claims that the Admission Agreement violated the NHA, the CFA and the TCCWNA.[2] She also asserted, on her own behalf, a claim for breach of contract and breach of lease.

Following the assertion of O'Neill's individual, fiduciary and class action claims, the matter was transferred to the Superior Court, Law Division. Thereafter, Manahawkin abandoned its attempt to claim the alleged balance on Hopkins' account. By a stipulation dated September 15, 2009, Manahawkin's complaint was dismissed with prejudice, with no award of costs to any party. The parties agreed that the dismissal of Manahawkin's collection claim was "made without any admission by the parties as to the merit of the claim and specifically [did] not affect defendant's counterclaim in any way." The record reflects no payment by O'Neill of any portion of the amount that

---

[1] Insofar as O'Neill named herself, in her fiduciary role as Executrix of Hopkins' estate, as a third-party plaintiff, she did not comply with Rule 4:8-1. Rule 4:8-1 confers "third-party plaintiff" status only upon "a defendant" in the original action. In her capacity as Executrix of Hopkins' estate, O'Neill was not a defendant in the action when she filed her third-party claims.

[2] In the initial third-party complaint, O'Neill also asserted claims pursuant to the Plain Language Act, N.J.S.A. 56:12-1 to -13, and the Civil Usury Law, N.J.S.A. 31:1-1 to -9, as well as unjust enrichment and breach of contract claims.

Manahawkin had sought when it filed its action in the Special Civil Part, and it appears that the claimed balance remained uncollected.

On April 1, 2011, O'Neill filed a First Amended Complaint, naming as third-party defendants Broadway Health Care Management, LLC (Broadway), M & A/Comprehensive Health Care Management Systems LLC (Comprehensive), M.R. of Manahawkin, LLC and H.W. of Manahawkin, LLC d/b/a Manahawkin Convalescent Center (collectively, defendants).[3] In her Amended Complaint, O'Neill asserted only her individual, fiduciary and putative class claims based on the NHA, CFA and TCWWNA, and abandoned her remaining claims. She sought certification of a class in her complaint, and filed a motion pursuant to Rule 4:32-1 for an order certifying a class.[4]

---

[3] O'Neill asserted in the summary judgment proceedings before the trial court that the defendants collectively "own and/or operate 10 nursing homes in New Jersey," including Manahawkin, and that Broadway and Comprehensive administer "the contracts and collections at the nursing homes they manage." Defendants denied both allegations. The parties disputed defendants' involvement in the ownership and operation of the Manahawkin nursing home, and the trial court made no findings with respect to that issue. Accordingly, the trial court never determined each defendant's role in the ownership and operation of Manahawkin.

[4] The putative class alleged in O'Neill's amended complaint consisted of "all those natural persons who were Medicare or Medicaid beneficiaries and were subject to the Defendants' Admission Agreement that either named a 'responsible persons' or . . . required third party guarantee of payment as a condition of admission, expedited admission, and/or continued residence at

11

Following discovery, the parties cross-moved for summary judgment. O'Neill's counsel represented to the trial court that there were at least fifty individuals who had been named "Responsible Parties" in Admission Agreements with Manahawkin. However, O'Neill presented no evidence that she or any other "Responsible Party" had been compelled to use his or her personal assets to pay for a nursing home resident's care. In oral argument before the trial court, O'Neill's counsel conceded that O'Neill had paid no money from her personal assets for her mother's care.

The trial court granted summary judgment in defendants' favor. It concluded that the Admission Agreement was devoid of any provision compelling a "Responsible Party" to assume personal liability for a Medicaid patient's contractual obligation, or language that would lead a Responsible Party to believe that his or her assets were implicated when the resident incurred charges for nursing home care. The court noted that the Private Pay Guarantor provision was unsigned in this case, and that the Resident's Bill of Rights form -- with its express disclaimer of a third party guarantee of patient obligations -- was among the documents provided to O'Neill during the admission process.

the facility." On September 2, 2011, the trial court denied O'Neill's motion for class certification.

12

The trial court further found that the letter from David Goldberg, which notified O'Neill of Manahawkin's claim of an outstanding balance and threatened potential litigation, sought to compel O'Neill to pay the balance from her mother's funds, not O'Neill's personal funds. The court acknowledged that Manahawkin's Special Civil Part complaint was poorly drafted, but concluded that all parties understood that the complaint sought to compel O'Neill to assist Manahawkin's effort to collect Hopkins' assets in payment of the amount allegedly owed to it. The trial court held that the NHA was clear, the Admission Agreement language was clear, and that both constrained Manahawkin from seeking to collect a Responsible Party's personal assets as payment for a resident's care. The trial court entered summary judgment dismissing O'Neill's claims.

O'Neill appealed, and an Appellate Division panel affirmed the trial court's judgment. Manahawkin Convalescent v. O'Neill, 426 N.J. Super. 143, 147 (App. Div. 2012). The panel acknowledged that federal and state law barred Manahawkin from legally requiring O'Neill to use her personal assets to satisfy her mother's obligations. Id. at 152-53. It concurred with the trial court, however, that Manahawkin had neither expressly nor implicitly attempted to collect O'Neill's personal assets in payment of her mother's account, and accordingly concluded that

13

the nursing home had not violated the NHA.  Id. at 153.  The panel concluded that Manahawkin was entitled to seek payment from O'Neill as the Responsible Party, and that it had pursued such payment in a lawful manner.  Id. at 156.  It therefore held that O'Neill had failed to satisfy the CFA's threshold requirement that a plaintiff demonstrate unlawful conduct by the defendant.  Id. at 153-54.  Raising an issue that had not been addressed by the parties before the trial court or on appeal, the panel further concluded that nursing homes are not within the scope of the CFA by virtue of the learned professional exception to the statute.  Id. at 154-56.  The panel did not reach O'Neill's TCCWNA claim.  It held that the trial court had properly granted summary judgment dismissing the complaint.  Id. at 147.

This Court granted certification.  212 N.J. 430, 431 (2012).

### III.

O'Neill argues that by its plain language, the Admission Agreement violates the NHA.  She cites a provision of the Admission Agreement that authorizes Manahawkin to place a lien on the property of the "Resident and Responsible Party" if a nursing home bill is unpaid.  O'Neill also notes the absence of language limiting Manahawkin's remedy to payment from the resident's assets.  O'Neill challenges the characterization of

14

Manahawkin's action in the Special Civil Part as a form of notice to O'Neill about her mother's outstanding balance, rather than as an attempt to hold O'Neill personally liable for that balance. She asserts that reliance upon the Private Pay Guarantor section of the contract is improper because this provision is not part of the parties' agreement, and is therefore irrelevant. O'Neill challenges the Appellate Division's holding with respect to the learned professional exception to the CFA as both procedurally improper, given the parties' failure to raise that issue before the trial court, and substantively incorrect. She argues that the panel should not have dismissed her TCCWNA claim without undertaking a separate analysis of that claim.

Defendants argue that the Admission Agreement does not violate the NHA because it does not purport to require a Responsible Party to use his or her personal assets to pay a resident's nursing home bills. Defendants cite the unexecuted Private Pay Guarantor provision in support of this assertion. They contend that Manahawkin's Special Civil Part action against O'Neill was not filed to press O'Neill to personally pay the outstanding balance on Hopkins' account as a "Responsible Party," but to compel her to exercise her control over her mother's assets, including Hopkins' final Social Security payment, to pay off Hopkins' account balance. Defendants argue

15

that O'Neill's CFA claims were properly dismissed under the "learned professional" exception to the CFA.

Amicus Curiae Legal Services of New Jersey (LSNJ) asserts that in an effort to circumvent the NHA, nursing homes routinely create third-party liability for costs incurred by residents covered by Medicaid and Medicare by designating "Responsible Parties" in admission agreements, and pursuing those parties personally for residents' unpaid bills. LSNJ argues that nursing homes have NHA-compliant remedies in collection actions that do not implicate the personal liability of the Responsible Party, including specific performance, declaratory relief, or tort remedies. LSNJ further argues that O'Neill's CFA claim should not have been dismissed, because she presented evidence establishing the elements of that claim, and because nursing homes should not be exempted from the CFA under the "learned professional" exception to the statute.

## IV.

The Court reviews de novo the trial court's entry of summary judgment dismissing O'Neill's claims. Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013); Coyne v. State of N.J. Dep't of Trans., 182 N.J. 481, 491 (2005). "Summary judgment must be granted if 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

16

any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Brandt, supra, 214 N.J. at 91 (quoting R. 4:46-2(c)). The Court determines "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

The factual findings of a trial court are reviewed with substantial deference on appeal, and are not overturned if they are supported by "adequate, substantial and credible evidence." Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 293 (2001), cert. denied, 535 U.S. 1077, 122 S. Ct. 1959, 152 L. Ed. 2d 1020 (2002); see Brandt, supra, 214 N.J. at 92. However, a "'trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.'" Brandt, supra, 214 N.J. at 92 (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). When a trial court's decision turns on its construction of a contract, appellate review of that determination is de novo. Kieffer v. Best Buy, 205 N.J. 213, 222 (2011) (citing Jennings v. Pinto, 5 N.J. 562, 569-70 (1950)). Appellate courts give "no special deference to the

17

trial court's interpretation and look at the contract with fresh eyes." Id. at 223 (citing Manalapan Realty, supra, 140 N.J. at 378).

A.

We first consider whether the Appellate Division properly concluded that Manahawkin did not violate the NHA. As enacted by the Legislature, the NHA serves to complement the federal Nursing Home Reform Act, 42 U.S.C.A. § 1396r, Congress's statutory scheme intended to protect nursing home residents and their families. See generally Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4211, 101 Stat. 1330, 182, 182-221. One component of the federal statutory scheme, 42 U.S.C.A. § 1396r(c)(5)(A)(ii), provides that "a nursing facility must . . . not require a third party guarantee of payment to the facility as a condition of admission (or expedited admission) to, or continued stay in, the facility." As explained in 42 U.S.C.A. § 1396r(c)(5)(B)(ii), there is a distinction between a nursing home resident's assets in the control of a third party, which may be pursued by the facility, and that third party's personal funds, which are beyond the facility's reach:

> Subparagraph (A)(ii) shall not be construed as preventing a facility from requiring an individual, who has legal access to a resident's income or resources available to pay for care in the facility, to sign a contract (without incurring personal financial liability) to provide payment from

18

> the resident's income or resources for such
> care.

Similar language appears in 42 U.S.C.A. § 1395i-3(c)(5)(A)(ii) and 42 U.S.C.A. § 1395i-3(c)(5)(B)(ii), which govern skilled nursing facilities that accept Medicare.[5] Accordingly, federal law has long barred nursing homes accepting either Medicaid or Medicare from compelling third party guarantees of resident payment, but permits such facilities to require individuals with legal access to the resident's assets to pay for the resident's care with such assets.

Although our Legislature enacted the NHA in 1976, prescribing a nursing home's responsibilities to its residents and the corresponding rights of those residents, it did not address the payment of resident bills in the original statute. L. 1976, c. 120 §§ 1-12; N.J.S.A. 30:13-1 to -11. In 1997, the Legislature amended the NHA to add language similar to that of 42 U.S.C.A. § 1396r(c)(5)(A)(ii):

> A nursing home shall not, with respect to an
> applicant for admission or a resident of the
> facility[,] require a third party guarantee
> of payment to the facility as a condition of
> admission or expedited admission to, or
> continued residence in, that facility;

_____

[5] Federal regulations promulgated pursuant to the statute confirm that the ban on third party guarantee requirements "applies to all residents and prospective residents regardless of the payment source in both Medicaid [nursing homes] and Medicare [nursing homes]." Medicare and Medicaid; Requirements for Long Term Care Facilities, 56 Fed. Reg. 48826 (Sept. 26, 1991); accord 42 C.F.R. § 483.12 (2013).

except that when an individual has legal access to a resident's income or resources available to pay for facility care pursuant to a durable power of attorney, order of guardianship or other valid document, the facility may require the individual to sign a contract to provide payment to the facility from the resident's income or resources without incurring personal financial liability.

[L. 1997, c. 241, § 3 (codified at N.J.S.A. 30:13-3.1(a)(2)).]

This provision applies only "to those distinct parts of a nursing home certified to participate in the Medicare or Medicaid program." N.J.S.A. 30:13-3.1(c).

The Legislature incorporated enforcement and remedial provisions in the NHA. The statute authorizes the Commissioner of Health to promulgate regulations pursuant to the statute. N.J.S.A. 30:13-10. The Department of Health and Senior Services is empowered to maintain an action in the name of the State to enforce the provisions of the NHA and any pertinent regulations. N.J.S.A. 30:13-8(a). Any "person or resident whose rights as defined herein are violated" has a cause of action against "any person committing such violation," with provisions for an award of "actual and punitive damages" and "reasonable attorney's fees and costs[.]" N.J.S.A. 30:13-8(a). In addition to the remedies prescribed by N.J.S.A. 30:13-8(a), "treble damages may be awarded to a resident or alleged third party guarantor of

20

payment who prevails in any action to enforce the provisions of [N.J.S.A. 30:13-3.1]." N.J.S.A. 30:13-8(b).

O'Neill's NHA claim against Manahawkin is premised upon three alleged violations of the statute. First, O'Neill contends that the Admission Agreement's language required her to spend her personal funds to pay her mother's bills. Second, O'Neill asserts that Manahawkin's March 26, 2009 letter demanding payment of a claimed outstanding balance constituted an attempt to coerce her into using her own assets to pay the facility's final bill. Third, O'Neill contends that when it filed its collection action against O'Neill in the Special Civil Part, Manahawkin sought a remedy against O'Neill in her individual capacity, rather than in her fiduciary role as Executrix of Hopkins' estate.

We consider the Admission Agreement in accordance with familiar rules of construction. Contracts should be read "as a whole in a fair and common sense manner." Hardy ex rel Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009). Courts enforce contracts "based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." Caruso v. Ravenswood Developers, Inc., 337 N.J. Super. 499, 506 (App. Div. 2001) (citing Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993)). If the language of a contract "'is plain and capable of legal

21

construction, the language alone must determine the agreement's force and effect.'" Twp. of White v. Castle Ridge Dev. Corp., 419 N.J. Super. 68, 74-75 (App. Div. 2011) (quoting CSFB 2001-CP-4 Princeton Park Corporate Ctr., LLC v. SB Rental I, LLC, 410 N.J. Super. 114, 120 (App. Div. 2009)); cf. Leonard & Butler, P.C. v. Harris, 279 N.J. Super. 659, 671 (App. Div. ) (noting "the principle that unambiguous contracts will be enforced as written unless they are illegal or otherwise violate public policy"), certif. denied, 141 N.J. 98 (1995). Even in the interpretation of an unambiguous contract, we may consider "all of the relevant evidence that will assist in determining [its] intent and meaning." Conway v. 287 Corporate. Ctr. Assocs., 187 N.J. 259, 269 (2006).

The trial court properly construed the Admission Agreement, and correctly concluded that the Agreement contravened neither 42 U.S.C.A. § 1396r(c)(5)(A)(ii) nor its state law analogue in the NHA, N.J.S.A. 30:13-3.1. Nowhere in the definition of "Responsible Party," or the Admission Agreement's provision addressing the Responsible Party's role in the payment of resident's obligations, is there any suggestion that the Responsible Party commits his or her personal assets to pay for the resident's care. The only language suggesting such an obligation appears in the section entitled "Private Pay Guarantor (if applicable)," which O'Neill was not required to

22

execute as a condition of her mother's admission as a resident covered by Medicaid. Indeed, any suggestion that O'Neill's assets were at risk by virtue of her execution of the Admission Agreement is belied by the Resident's Bill of Rights form, the receipt of which O'Neill acknowledged in the Admission Agreement. Consistent with federal statutes and regulations and the NHA, the Resident's Bill of Rights form specifically limited O'Neill's obligation to the payment of bills using Hopkins' assets under O'Neill's legal control, and underscored the parties' intent to comply with federal and state law. The Resident's Bill of Rights form confirms that neither party to the Admission Agreement intended that O'Neill's personal assets would be used to pay Hopkins' nursing home bills. The trial court properly construed the Admission Agreement to limit O'Neill's obligation to the payment of Hopkins' bills with Hopkins' assets, and correctly found that the Agreement therefore complied with the NHA.

Manahawkin's March 26, 2009 collection letter was inartfully drafted and devoid of important details. It did not, however, purport to assert rights on the facility's behalf beyond those set forth in the Admission Agreement, and authorized by the NHA. The letter referred to O'Neill's status as the Responsible Party, and reiterated that the "debts" sought to be collected were those that Manahawkin claimed were "owed by

23

[Hopkins] to the facility." The letter's reference to an "obligation" on O'Neill's part to pay Hopkins' debts was consistent with the provision in the Admission Agreement that required the Responsible Party to pay Manahawkin's bills. The trial court correctly found that the March 26, 2009 letter did not attempt to impose upon O'Neill an obligation to use her personal assets on her mother's behalf.

The Special Civil Part complaint -- prepared, according to Comprehensive's owner Stephen Krausman, by a non-lawyer -- was similarly imprecise. As O'Neill and amicus concede, Manahawkin had a potential cause of action against O'Neill, in her capacity as Executrix of her mother's estate and in accordance with her obligation to pay the bills with Hopkins' assets under her control, for unpaid bills incurred for Hopkins' care. In its Special Civil Part complaint, Manahawkin should have made clear that its claim for Hopkins' account balance was either asserted against O'Neill in her fiduciary capacity as Executrix of Hopkins' estate, or against O'Neill individually based solely upon her contractual obligation to arrange for the payment of Hopkins' bills. Instead, making no distinction between O'Neill's potential liability as a fiduciary and her potential personal liability for her mother's bills, Manahawkin named her as the defendant in its Special Civil Part complaint. Accordingly, Manahawkin's cause of action was not defined in

24

sufficient detail in the Special Civil Part complaint and was not properly pled.

Nonetheless, Manahawkin's filing of the Special Civil Part complaint did not violate the NHA. N.J.S.A. 30:13-3.1(a)(2) defines the scope of the agreement that a nursing home can require a "Responsible Party" with legal access to a resident's income or resources to execute as a condition of the resident's admission at or retention by a Medicaid or Medicare-certified nursing home. Manahawkin's Special Civil Part complaint was an action to enforce that Agreement. It included no allegation that the Admission Agreement required O'Neill to use her personal funds to pay Hopkins' bills.

Accordingly, the trial court's conclusion that the collection action filed by Manahawkin in the Special Civil Part did not improperly target O'Neill's personal funds was correct, and the court's dismissal of plaintiff's NHA claim was proper.

B.

We next consider O'Neill's CFA claim. The CFA was intended "to greatly expand protections for New Jersey consumers." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 555 (2009); see D'Agostino v. Maldonado, 216 N.J. 168, 183 (2013); Gonzales v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011); Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604 (1997). It was enacted "to combat 'sharp practices and dealings' that victimized

25

consumers by luring them into purchases through fraudulent or deceptive means."  Cox v. Sears Roebuck & Co., 138 N.J. 2, 16 (1994) (quoting D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 23 (App. Div. 1985)).  "The CFA is intended to 'be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud.'"  Gonzalez, supra, 207 N.J. at 576 (quoting Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264 (1997)); see also Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69 (1985) (noting that CFA was "passed in response to widespread complaints about selling practices that victimized consumers" and is "liberally construed in favor of protecting consumers").  To that end, N.J.S.A. 56:8-19 prescribes a cause of action on behalf of "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act."  N.J.S.A. 56:8-19.

A CFA claim requires proof of three elements: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss."  Bosland, supra, 197 N.J. at 557; accord Lee v. Carter-Reed Co., L.L.C., 203 N.J. 496, 522 (2010); Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc., 192 N.J. 372, 389 (2007); N.J.S.A. 56:8-19.  A

26

plaintiff who proves all three elements may be awarded treble damages, "attorneys' fees, filing fees and reasonable costs of suit." N.J.S.A. 56:8-19.

N.J.S.A. 56:8-2 identifies the type of conduct that constitutes an "unlawful practice" under the CFA:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.
>
> [N.J.S.A. 56:8-2.]

The statute defines sale as "any sale, . . . offer for sale, . . . or attempt directly or indirectly to sell." N.J.S.A. 56:8-1(e). Services are included within the purview of the statute. N.J.S.A. 56:8-1(c) defines "merchandise" to "include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c).

An unlawful practice under the CFA requires "fraudulent, deceptive or other similar kind of selling or advertising practices." Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 271

27

(1978).  "[A] simple breach of warranty or breach of contract is not per se unconscionable."  <u>Gennari v. Weichert Co. Realtors</u>, 288 <u>N.J. Super.</u> 504, 533 (App. Div. 1996), <u>aff'd as modified</u>, 148 <u>N.J.</u> 582, 590 (1997).  A party may, in certain circumstances, satisfy the "unlawful commercial practice" element of the CFA by presenting evidence of an agreement containing an unlawful term.  <u>See, e.g.</u>, <u>D'Agostino</u>, <u>supra</u>, 216 <u>N.J.</u> at 189 (upholding finding of unconscionable commercial practice based upon defendant's preparation of complex transactional documents that contravened parties' understanding of their agreements); <u>Green v. Morgan Props.</u>, 215 <u>N.J.</u> 431, 453-56 (2013) (affirming denial of defendant's motion to dismiss under <u>Rule</u> 4:6-2(e) on ground that plaintiff had presented prima facie evidence of "unlawful commercial practice," based upon allegation that defendant required execution of contract of adhesion incorporating unreasonable attorneys' fee provision); <u>Ryan v. Gina Marie, L.L.C.</u>, 420 <u>N.J. Super.</u> 215, 227 (App. Div. 2011) (finding landlord liable under CFA where provision of lease required tenant to pay rent in excess of municipality's rent control ordinance).

In her First Amended Complaint, O'Neill predicated her CFA claim upon defendants' alleged violation of the NHA, and upon defendants' alleged violation of TCCWNA, which in turn is premised upon a violation of the NHA.  She alleged:

28

[defendants'] practices in violation of the [NHA] and/or [TCWWNA] constitutes unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with services offered and as such violates the [CFA].

Thus tethered to her NHA claim, O'Neill's CFA claim was properly dismissed by the trial court. In light of the Admission Agreement's compliance with the NHA, Manahawkin did not engage in the unlawful practice alleged by O'Neill when it required O'Neill to execute the Admission Agreement as a "Responsible Party." Although Manahawkin's collection letter and Special Civil Part complaint were less than articulately drafted, neither expressly asserted that O'Neill was contractually required to pay her mother's bills from her personal assets. Thus, we concur with the trial court and the Appellate Division panel that O'Neill "cannot satisfy the first indispensable element [of the CFA], as we have concluded that the Admission Agreement is lawful." Manahawkin, supra, 426 N.J. Super. at 154. Therefore, the trial court properly dismissed O'Neill's CFA claim.

The parties raised two other issues with respect to the CFA. First, before this Court, the parties addressed whether nursing homes are exempt from the statute pursuant to the

29

exception for learned professionals.  Before the trial court and Appellate Division, neither party had raised the question of whether the transactions at issue -- Manahawkin's Admission Agreement, collection efforts and lawsuit against O'Neill -- constitute services provided by learned professionals in their professional capacity.  Further, Manahawkin did not assert the learned professional exception as a defense in its answer to O'Neill's counterclaims.  Nonetheless, the Appellate Division panel held that nursing homes qualify as learned professionals, and, in part, premised its decision affirming the trial court's grant of summary judgment on that holding.  In light of our affirmance of the trial court's finding that Manahawkin committed no "unlawful practice" for the purposes of the CFA, we do not reach the issue of whether the nursing home's conduct at issue in this case is exempt from the CFA under the "learned professional" exception.  No record was developed before the trial court sufficient to support a determination as to whether the exception applies, and the parties had no opportunity to brief the issue prior to the Appellate Division's decision.  We have serious doubts that the billing and collection function at issue in this case would qualify for the learned professional exception to the CFA, "whereby certain transactions fall outside the CFA's purview because they involve services provided by learned professionals in their professional capacity."  Lee v.

30

First Union Nat. Bank, 199 N.J. 251, 263 (2009) (citing Macedo v. Dello Russo, 178 N.J. 340, 345-46 (2004)).

Second, the parties disputed whether O'Neill made a showing of "ascertainable loss" within the meaning of N.J.S.A. 56:8-19. In the absence of proof of an "unlawful practice" for purposes of the CFA, we do not determine whether O'Neill sustained an "ascertainable loss" by virtue of the Admission Agreement, Manahawkin's March 26, 2009 letter or the collection action filed by Manahawkin, which was dismissed with prejudice at an early stage and never proceeded to judgment.

C.

Finally, we consider O'Neill's claim under the TCCWNA. N.J.S.A. 56:12-15 provides in relevant part:

> No seller . . . shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign . . . which includes any provision that violates any clearly established legal right of a consumer . . . as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.
>
> [N.J.S.A. 56:12-15.]

The TCCWNA was enacted in 1981 "to prevent deceptive practices in consumer contracts by prohibiting the use of illegal terms or warranties in consumer contracts." Shelton v.

31

Restaurant.com, Inc., 214 N.J. 419, 427-28 (2013) (quoting Kent Motor Cars, Inc. v. Reynolds & Reynolds Co., 207 N.J. 428, 457 (2011)). The statute "prohibits a seller from entering into a contract with a consumer that includes any provision that violates a federal or state law." Bosland, supra, 396 N.J. Super. at 278. "The rights, remedies and prohibitions conferred by the TCCWNA are 'in addition to and cumulative of any other right, remedy or prohibition accorded by common law, Federal law or statutes of this State.'" Shelton, supra, 214 N.J. at 428 (quoting N.J.S.A. 56:12-18). Those remedies include a civil penalty, an award of actual damages, "or both at the election of the consumer" as well as reasonable attorneys' fees and court costs. Ibid. (citing N.J.S.A. 56:12-17)

Like her CFA claim, O'Neill's TCCWNA claim is predicated upon an alleged violation of the NHA's prohibition on Medicaid or Medicare certified nursing homes requiring third party guarantees of payment as a condition of resident admission or retention. Citing Rule 1:7-4, O'Neill argues that the Appellate Division erred when it affirmed the dismissal of all claims, including O'Neill's TCCWNA claim, without separate findings or independent analysis. Rule 1:7-4 requires the trial court "by an opinion or memorandum decision, either written or oral, [to] find the facts and state its conclusions of law thereon . . . on every motion decided by a written order that is appealable as of

right." "Implied in the judge's fact-finding responsibilities is the judge's obligation to decide all critical issues." Pressler & Verniero, Current N.J. Court Rules, comment 1 on R. 1:7-4 (2014). Nonetheless, when a trial court fails to make findings on a specific issue, an appellate court may "opt, in appropriate circumstances and particularly where there has been considerable litigation delay, to decide the legal issues clearly raised despite the lack of findings of fact" and conclusions of law on the specific issue. Ibid. (citing Leeds v. Chase Manhattan Bank, 331 N.J. Super. 416, 420-21 (App. Div. 2000)).

Here, the trial court's key determination -- that the Admission Agreement did not improperly condition Hopkins' admission to Manahawkin on O'Neill's guarantee that she would pay Hopkins' bills with her own assets -- resolved O'Neill's TCCWNA claim. O'Neill pled no violation of the TCWWNA independent of her claim that the Admission Agreement contravened the NHA. Accordingly, while the trial court should have addressed the TCCWNA claim in its ruling, the Appellate Division's determination on that claim was consistent with Rule 1:7-4. Therefore, we affirm that determination.

V.

Although Manahawkin did not violate the NHA, TCWWNA or CFA, its Admission Agreement, collection letter and Special Civil

33

Part complaint failed to adequately set forth the respective rights and duties of the parties. In the Admission Agreement, Manahawkin should have explained to O'Neill the specific obligations that may be imposed upon a Responsible Party, consistent with the NHA, and the remedies available to Manahawkin in the event of a default of those obligations. Manahawkin accurately summarized the relevant NHA provision in its Resident's Bill of Rights form, and should have incorporated similar language in the contract itself. The Admission Agreement would have better served both parties had it specifically addressed the status of a Responsible Party who acts on behalf of a resident in a Medicaid or Medicare-certified nursing home.

Manahawkin's March 26, 2009 collection letter and Special Civil Part complaint failed to clearly articulate the nursing home's legal rights. In its collection letter, Manahawkin provided only a partial explanation of Manahawkin's potential cause of action against O'Neill. Manahawkin did not explain to O'Neill what it later represented to the trial court: that Manahawkin intended to demand nothing more than that Hopkins' account balance be paid by O'Neill in her fiduciary capacity, using the assets of Hopkins' estate under her control. The Special Civil Part complaint was similarly sparse and unclear. The pleading neither alleged O'Neill's control over her mother's

34

assets nor pled a cause of action against her in her fiduciary capacity. Manahawkin's decision to utilize the services of a non-lawyer to draft its collection documents did not obviate the need for those documents to properly identify the defendant and to define the legal right that the nursing home sought to vindicate.

We urge counsel for this important industry, serving elderly and disabled residents and their families, to ensure that nursing home contracts are prepared -- and collection practices conducted -- in a manner that fosters a clear understanding of each party's rights and remedies as it complies with the law.

The judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA and ALBIN, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE PATTERSON's opinion.

35

SUPREME COURT OF NEW JERSEY

NO.     A-17                          SEPTEMBER TERM 2012

ON CERTIFICATION TO        Appellate Division, Superior Court

MANAHAWKIN CONVALESCENT,
        Plaintiff,


                v.


FRANCES O'NEILL,
        Defendant,


            and


FRANCES O'NEILL in her
Capacity as Executrix of the
Estate of ELISE HOPKINS,
        Third-Party Plaintiff-
        Appellant

                v.


BROADWAY HEALTH CARE
MANAGEMENT, LLC;
M&A/COMPREHENSIVE HEALTH CARE
MANAGEMENT SYSTEMS, LLC; M.R.
OF MANAHAWKIN, LLC; and H.W.
OF MANAHAWKIN, LLC d/b/a
MANAHAWKIN CONVALESCENT
CENTER,
        Third-Party Defendants-
        Respondents.


DECIDED          March 11, 2014
                Chief Justice Rabner              PRESIDING
OPINION BY          Justice Patterson
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY


| CHECKLIST | AFFIRM | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |