**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1475-14T1

JOHN M. HAMMER,

    Plaintiff-Appellant/
    Cross-Respondent,

v.

HAIR SYSTEMS INC., a corporation
of the State of New Jersey,
WILLIAM E. COVEY and MARJORIE M.
COVEY, and WILLIAM E. COVEY, JR.,

    Defendants-Respondents/
    Cross-Appellants.

_____

Argued April 5, 2017 — Decided June 9, 2017

Before Judges Alvarez, Manahan, and Lisa.

On appeal from the Superior Court of New
Jersey, Law Division, Monmouth County, Docket
No. L-1464-03.

Bruce D. Greenberg argued the cause for
appellant/cross-respondent (Lite DePalma
Greenberg, LLC, attorneys; Mr. Greenberg, of
counsel and on the briefs; Danielle Y.
Alvarez, on the briefs).

William D. Wallach argued the cause for
respondents/cross-appellants (McCarter &
English, LLP, attorneys; Mr. Wallach, of
counsel and on the briefs; Brian W. Carroll,
on the briefs).

PER CURIAM

This matter began in 2003 with the filing of plaintiff John M. Hammer's complaint. The years of litigation which followed include our 2009 decision on a leave-granted appeal of partial summary judgment awarded to Hammer.[1]

Eventually, the Honorable Paul A. Kapalko, J.S.C., conducted a bench trial over the course of sixteen days, and rendered a thoughtful, detailed, and cogent 137-page decision, later supplemented with a twenty-two-page opinion on one of two remaining unresolved issues. On September 23, 2013, the judge rendered a final thirteen-page decision resolving the remaining issue, counsel fees. To say the matter was vigorously and fully litigated is an understatement. The parties now appeal and cross-appeal. With the exception of the counsel fee awards, we affirm based on the judge's nuanced and careful consideration in this case, in which oppressed minority shareholder claims, among other causes of action, were alleged. We affirm the award of fees to Hammer but vacate the award to defendants.

We summarize the relevant testimony. Defendant Hair Systems, Inc. (HSI), is a closely held family-owned corporation engaged in the business of developing, manufacturing, and packaging hair care

---

[1] Hammer v. Hair Sys., Inc., Nos. A-2791-07, A-1893-08 (App. Div. June 18, 2009).

products.  William E. Covey, Sr. (Covey), now deceased, was the Chairman of the Board; his wife defendant Marjorie Covey (Marjorie)[2] was the Executive Vice-President and Treasurer.  Their son William E. Covey, Jr. (William), was the President and Chief Operating Officer.  Mabel Covey (Mabel), William's wife, was HSI's Chief Technical Officer/Vice-President of Science and Technology. Sharon Griffith (Griffith), Covey and Marjorie's daughter, was the Corporate Secretary and Accounting Manager.  A third child, Anne Covey (Anne), and her husband served as outside counsel.  Aftab Shah (Shah) and Deborah Shah (Deborah) were the Director of Manufacturing and Director of Customer Service, respectively, and close friends of the Coveys.  The Covey family controlled the majority of the shares of HSI.

Hammer, after a long and successful career in the hair care industry, retired from full-time employment in 1997 and thereafter maintained a consultancy business.  At Covey's suggestion, Hammer joined HSI's Board of Advisors in 1998.  He had access to all of HSI's financial records while working on a report titled "Hair Systems, Inc. State of the Company."  In the report, he identified the corporation's need to transition from a "family culture to an organizational culture" in addition to addressing cash flow

---

[2] We refer to some family members by their first names solely to avoid confusion.

problems. Hammer testified, however, that when he prepared his report he was not aware of the host of personal expenses which the company paid on behalf of the Coveys and the Shahs, ranging from construction work on their homes to child care.

When Covey was diagnosed with multiple myeloma in 2000, he engaged Hammer in a full-time management position, and Hammer and his wife moved from California to New Jersey. The judge found Hammer and HSI then entered into a five-year employment contract in which he was employed as Chief Executive Officer (CEO) commencing October 29, 2001. The parties agreed that during the initial year of employment, payment of $125,000 of Hammer's salary would be deferred, to earn interest at 6.5% per year. Additionally, Hammer received 200 shares of HSI's common stock, representing two percent of the company's value, as a signing bonus, and had an option to purchase additional stock pursuant to the company's incentive performance stock option program.

Hammer's time with the company did not go smoothly. He made unpopular recommendations regarding both the positions and supervision hierarchy of the Covey and Shah families. During an April 9, 2002 performance review conducted by Covey, although Hammer was generally rated excellent, Covey noted that Hammer's behavior required modification, that he needed to "slow down [the]

pace of organizational changes" and that he had a "tendency to intimidate staff" with his "tone of voice, body language, etc."

At the start of his employment, Hammer received an employee handbook that outlined HSI's anti-harassment policies, including this definition of sexual harassment: "commentary about an individual's body," and "unnecessary touching, including patting, pinching, or repeated brushing against another's body." The handbook stated that such conduct would result in disciplinary action up to termination.

By the spring of 2002, as thoroughly detailed in the trial judge's opinion, employees began to complain that Hammer inappropriately touched them and made sexual comments to them. The company, in an effort to address the problems, actually conducted a sexual harassment training in which Hammer participated. Afterwards, Hammer was heard to say that if he had to keep his hands to himself, he "might as well move back to the desert."

Among the examples of objectionable conduct the trial judge enumerated in his decision, described by witnesses he found credible, were Hammer touching women on the neck, shoulders, and back, and giving massages. Hammer commented to one employee that she should participate in a "weigh in[,]" complained about another

who was taking time off for a religious holiday, and referred to those of her faith as "you people."

Ultimately, HSI retained outside counsel, Frank M. Ciuffani, Esquire, to conduct an investigation, completed in 2002. Ciuffani reported that although some of the employees he interviewed did not describe any misconduct in their interactions with Hammer, multiple workers described incidents in which Hammer made sexual comments and weight-related remarks, and touched them without their consent.

When Hammer was interviewed by Ciuffani, he stated that he was very "touchy" with employees, and that he "could have" made comments about sex to female employees. Until his interview, Hammer was unaware of the investigation.

During the trial, Hammer challenged the validity and timing of the harassment investigation, attributing it to the Coveys' desire to terminate his employment. In addition to Ciuffani's testimony, both sides presented experts who essentially evaluated the merits and fairness of Ciuffani's investigation.

The judge, however, credited the conclusions and recommendations reached in the investigation. In partial reliance on the report, the judge found that although Hammer entered into a five-year contract with HSI, and was not an employee at will, his termination was warranted and was not retaliatory nor an

instance of conduct towards him by majority shareholders that made him an oppressed shareholder.

Hammer raises the following points for our consideration:

POINT I
The Law Division Applied the Wrong Legal Standard in Reviewing the Majority Shareholders' Decision to Fire Hammer.

POINT II
The Law Division Made a Legal Error in Holding that the Individual Defendants Could Not be Sued for Tortious Interference with Hammer's Contract With HSI.

POINT III
The Law Division Wrongly Denied Hammer's Right to Purchase Shares of HSI Under the Parties' Incentive Stock Option Agreement, Thereby Permitting Defendants to Benefit from Their Unlawful Withholding of Hammer's Deferred Compensation.

POINT IV
The Trial Judge Miscalculated the "Fair Value" of Hammer's Minority Ownership Interest in HSI by Disallowing Certain Add-Backs.

POINT V
The Trial Judge Erred in Denying Some of Hammer's Counsel Fees and in Granting Defendants Any Counsel Fees.

    A.   Hammer's Counsel Fees.
    B.   Defendants' Counsel Fees.

Defendants raise the following in their cross-appeal:

POINT I
The Trial Court Erred In Finding Plaintiff To Be An Oppressed Minority Shareholder And In Awarding Plaintiff Exorbitant Attorneys' Fees And Prejudgment Interest.

A.  The Trial Court Erred In Finding
    Plaintiff Was An Oppressed Minority
    Shareholder.

b.  The Attorneys' Fees Awarded To Plaintiff
    Were Grossly Excessive In Light of
    Plaintiff's Limited Recovery.

C.  Prejudgment Interest Was Not Warranted.

POINT II
Plaintiff's Claims Should Be Denied on Appeal
Consistent with Well-Established Standards of
Review and Pertinent Case Law.

A.  The Trial Court Properly Dismissed
    Plaintiff's Wrongful Termination Claims.

        i.  Wrongful Termination Claim
        Against Hair Systems Inc.
        ii. Tortious Interference Claim
        Against Individual Defendants.

B.  The Trial Court Properly Dismissed
    Plaintiff's Stock Option Claim.

C.  The Trial Court Properly Rejected
    Plaintiff's Further Adjustments to the
    Value of His 2% Stock Interest.

### I.

The final determinations of a trial court sitting in a non-jury case are subject to limited appellate review, and we leave them undisturbed if there is substantial evidence to support them. Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011). The factual findings and legal conclusions of the trial judge should not be disturbed unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible

evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974). Deference to a court's factual findings "is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Our review of questions of law is plenary. Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016).

II.

A.

We first address Hammer's contention that his termination was improperly orchestrated by the majority shareholders. See N.J.S.A. 14A:12-7(1)(c). We include in the discussion defendants' contention that although Hammer was a minority shareholder, he did not fall within the purview of the statute because he was well aware of company practices as a result of the report he prepared for HSI before his employment began.

N.J.S.A. 14A:12-7(1)(c) provides that minority shareholders of a corporation with fewer than twenty-five shareholders may bring an action when the corporation's directors

> have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities

as shareholders, directors, officers, or employees.

If a court determines that a person is an oppressed minority shareholder (OMS), it may in its discretion impose equitable remedies, including the appointment of a custodian or sale of stock. Ibid. The statute reflects the legislature's recognition that minority shareholders in close corporations are uniquely vulnerable because they may be "frozen out" of the decision making process and cannot readily sell their shares when they disagree with the majority's actions. Brenner v. Berkowitz, 134 N.J. 488, 505 (1993); Exadaktilos v. Cinnaminson Realty Co., Inc., 167 N.J. Super. 141, 152-53 (Law Div. 1979), aff'd, 173 N.J. Super. 559, certif. denied, 85 N.J. 112 (1980).

Oppression in the context of an OMS action does not always require illegality or fraud by majority shareholders or directors. Brenner, supra, 134 N.J. at 506-07. Instead, oppression is defined as the frustration of a minority shareholder's reasonable expectations. Ibid. A court must first determine the shareholders' expectations of the corporation. Exadaktilos, supra, 167 N.J. Super. at 155. "Armed with this information, the court can then decide whether the controlling shareholders have acted in a fashion that is contrary to this understanding." Ibid.

The complaining shareholder has the burden to demonstrate a nexus between the alleged oppressive conduct and his or her interest in the corporation. Brenner, supra, 134 N.J. at 508. In determining that nexus, "[t]he court has discretion to determine which factors are pertinent to its evaluation of the quality and nature of the misconduct." Ibid. Both monetary and non-monetary harm to a minority shareholder should be considered. Id. at 509. For example, the court should consider how the shareholder's position within the corporation may have been affected by the complained-of actions. Ibid.

A minority shareholder's expectations must also be balanced against the corporation's ability to exercise its judgment to run its business efficiently. Muellenberg v. Bikon Corp., 143 N.J. 168, 179 (1996). Mere disagreement or discord between the shareholders is not sufficient to support a remedy under the statute. Brenner, supra, 134 N.J. at 506.

### B.

On appeal, Hammer is not challenging the Law Division's finding that the harassment complaints were made. His position is that it was a mistake for the court to conclude that he could have been legitimately terminated for that reason.

Termination of a minority shareholder's employment may constitute oppression under N.J.S.A. 14A:12-7(1)(c), because a

person who acquires a minority share in a closely-held corporation often does so "for the assurance of employment in the business in a managerial position." Muellenberg, supra, 143 N.J. at 180-81. Such a person thus has a reasonable expectation that they will enjoy "the security of long-term employment and the prospect of financial return in the form of salary," and will have "a voice in the operation and management of the business and the formulation of its plans for future development." Id. at 181. Where these expectations are frustrated by majority shareholders or directors, a court may find that oppression has occurred. Musto v. Vidas, 281 N.J. Super. 548, 556-58 (App. Div. 1995), certif. denied, 143 N.J. 328 (1996).

In this case, we agree with the trial court that Hammer's conduct in the workplace warranted termination. This was the case regardless of whether defendants may have also wanted to terminate his employment for reasons related to his proposals to move the company away from its family management style. We also agree with the judge that a minority shareholder's termination for good cause does not violate any reasonable expectation of continued employment, nor does it constitute oppression within the meaning of the statute.

In Exadaktilos, for example, the plaintiff shareholder's termination for cause did not render him an OMS. Supra, 167 N.J.

Super. at 155-56. In that case, the plaintiff failed to get along with other employees; caused the loss of key personnel; quit on multiple occasions without reason or notice; and "was not compatible with the other principals." Id. at 155. Accordingly, the court found that his termination was due to "his unsatisfactory performance" and that he had thwarted his own expectations of employment "through no fault of [the] defendants." Id. at 155-56.

In this case, Hammer thwarted HSI's attempts to modify his conduct in the workplace. He was given HSI's employee handbook, which warned that employees faced immediate termination if, after investigation, complaints of sexual harassment were substantiated. He acknowledged in writing that he understood the handbook, and knew that sexual harassment included "unnecessary touching, including patting, pinching, or repeated brushing against another's body," commenting on a co-worker's body, and inappropriate jokes. Therefore, even if defendants incidentally benefitted from the firing, Hammer could not reasonably expect his improper behavior, about which he was warned, and which warnings he ignored, would not result in termination. That he was a shareholder did not immunize the corporation either from the effect on its employees of sexual harassment, nor from potential corporate liability.

Substantial evidence and precedent support the court's rejection of Hammer's arguments about the timing of Covey's decision to terminate his employment, and the method by which the investigation into his behavior was conducted. He was terminated for good cause, which made the decision lawful. The judge's findings were not "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, supra, 65 N.J. at 484.

### C.

The trial judge found that certain actions taken by HSI's directors, after Hammer was hired, constituted oppression under N.J.S.A. 14A:12-7(1)(c), including their use of corporate money to pay for: outside child care services; preparation of personal tax returns; estate planning services; other personal services for family members; personal credit card charges; charitable contributions; personal insurance policies; and contracting and utility work at William's home. The court also found that the payment to Marjorie after her husband's death of his salary, as well as her salary, was unjustified. Furthermore, HSI's failure to pay a dividend for 2002 was "not effectively explained." Finally, HSI's directors failed to "fairly consider" many of Hammer's proposed changes to HSI's organization and operation.

This "refusal of family members to accommodate practical and responsible management policies" ran contrary to Hammer's reasonable expectations since he believed he had been hired to transform HSI into a less insular and family-oriented company.

On appeal, defendants do not deny the expenditures and other actions the court found to be oppressive. Instead, they argue that because Hammer performed consultant work for HSI prior to being hired as CEO, and had access to HSI's financial documents, he was aware of the directors' use of corporate money for personal expenses. Thus they contend he could not have had a reasonable expectation that corporate funds would not be used this way going forward.

"[O]ppression by shareholders is clearly shown when they have awarded themselves excessive compensation, furnished inadequate dividends, or misapplied and wasted corporate funds." Muellenberg, supra, 143 N.J. at 180. However, a court should consider "whether the minority shareholder was aware of the misconduct prior to filing suit but failed to act, and whether the minority shareholder participated in the misconduct." Brenner, supra, 134 N.J. at 509-10. A minority shareholder may be found to have waived the right to raise an OMS claim if he or she was "well aware" of the majority's misuse of corporate money but did not raise any objection or in fact benefitted from an improper

practice.  Belfer v. Merling, 322 N.J. Super. 124, 138-39 (App.

Div.), certif. denied, 162 N.J. 196 (1999).

Hammer testified that while acting as a consultant, he was unaware of the specific personal uses to which HSI's funds were being put, and that he only noted general "cash flow" issues when reviewing HSI's records for his consulting report.

The court found that any misappropriation of funds that occurred before Hammer became a shareholder could not be considered "oppression" for purposes of his OMS claim.  Indeed, the judge stated that Hammer knew, as demonstrated in the report he authored, of HSI's pervasive "family culture" and the resulting financial consequences.  Hammer had urged updates to record keeping methodology.  He tried to alter HSI's organizational structure to remove conflicts of interest, thus further indicating that he knew about defendants' practices, and expected defendants to change them.  However, the court went on to find that Hammer's report, which stressed the need for HSI to eliminate informalities in its financial practices, also established that defendants were aware that Hammer expected this type of change to occur once he was hired and acquired an ownership interest.

Substantial evidence in the record supports the judge's findings. It is undisputed that HSI's directors diverted corporate funds for personal use, that Hammer identified the problem this

created when he acted as HSI's consultant and afterwards, and that the diversion of funds for the benefit of the Covey and Shah families to the corporation's detriment continued after Hammer became a shareholder. By contrast, there is no evidence to support defendants' assertion that Hammer waived his right to raise an OMS claim because he acquiesced in their behavior. Hammer began attempting to make changes to HSI almost immediately after becoming CEO, to the extent that Covey, during his performance review, instructed him to temper his efforts. Hammer reasonably expected his recommendations as CEO to be considered and implemented, but they were not. Therefore, the court's rejection of defendants' waiver argument was appropriately based on the record.

We agree that Hammer was an OMS in light of defendants' business practices based on substantial credible evidence. The conclusion the judge reached, in light of this record, does not offend the interests of justice. See Seidman, supra, 205 N.J. at 169.

### III.

#### A.

Hammer contends that the court erred in granting summary judgment dismissing his claim against the individual defendants for tortious interference with his employment contract. He argues that these defendants, although shareholders and officers of HSI,

17

were distinct from the corporation and subject to individual liability. The dismissed defendants include Covey and Marjorie.

"A ruling on summary judgment is reviewed de novo." Davis v. Brickman Landscaping, LTD., 219 N.J. 395, 405 (2014) (citing Manahawkin Convalescent v. O'Neil, 217 N.J. 99, 115 (2014)). Thus, appellate review requires application of the same standard which governs the trial court. Ibid. (citing Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012)).

A motion for summary judgment should be granted when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. R. 4:46-2; Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Facts are to be viewed in a light most favorable to the non-moving party. Brill, supra, 142 N.J. at 540.

The tort of interference with a business relationship or contract involves four elements:

> (1) a protected interest; (2) malice — that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages.
>
> [DiMaria Constr., Inc. v. Interarch, 351 N.J. Super. 558, 567 (App. Div. 2001), aff'd, 172 N.J. 182 (2002).]

A claim of tortious interference "will only lie against defendants who are not parties to the contract." Id. at 568. This is because "[u]nder New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 316 (2002). Instead, "the actions of the parties to a contract are judged under contract law." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 760-61 (1989).

In Printing Mart, the Court held that where a party to a contract is a corporation, employees of that corporation "can be answerable for interfering with their employer's . . . contractual relationship" with another party, because they are not, as individuals, parties to any contract that the corporation enters. Id. at 761. Since that case, "a clear-cut consensus has emerged that if an employee . . . is acting on behalf of his or her employer . . . then no action for tortious interference will lie." DiMaria, supra, 351 N.J. Super. at 568. By contrast, if an employee acts outside the scope of his or her employment, a tortious interference claim may be brought. Id. at 568-69. An employee's conduct "falls outside the scope of the privilege if he or she 'acts for personal motives, out of malice, beyond his [or her] authority, or otherwise not in good faith in the corporate

19

interest.'" Ibid. (quoting Varrallo v. Hammond Inc., 94 F.3d 842, 849 n.11 (3d Cir. 1996)).

B.

Here, the individual defendants, Covey and Marjorie were directors, majority shareholders, and employees of HSI. Defendant's employment contract was with HSI, a corporation. Thus, under Printing Mart and its progeny, an action for tortious interference with the employment contract could proceed against the individuals only if the conduct alleged to be damaging fell outside the scope of their employment.

Sufficient evidence supports the court's determination that in terminating Hammer's employment, the individual defendants were acting in the interest of HSI, the corporate party to the contract. The individual defendants, particularly Covey, held the highest positions at HSI and had decision-making authority over Hammer's continued employment as part of their duties as employees and directors.

Covey terminated Hammer's employment for cause, only after an investigation by an outsider substantiated the complaints of harassment made against the employee. Although the individual defendants may have been troubled by some of Hammer's recommendations, there was no actual evidence tending to suggest that they held personal malice against him, or that the decision

20

to terminate his employment was made "without justification[.]" DiMaria, supra, 351 N.J. Super. at 567-68. Even viewing the facts in the light most favorable to Hammer as the non-moving party, it is clear that the individual defendants, to the extent they acted to terminate Hammer, did so as corporate officers who were parties to a contract. Dismissal of his claims against individual defendants for tortious interference was therefore proper.

IV.

A.

"When a trial court's decision turns on its construction of a contract, appellate review of that determination is de novo." Manahawkin Convalescent, supra, 217 N.J. at 115. No special deference is given to the trial court's interpretation, and the appellate court "look[s] at the contract with fresh eyes." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

"[U]nambiguous contracts will be enforced as written unless they are illegal or otherwise violate public policy." Leonard & Butler, P.C. v. Harris, 279 N.J. Super. 659, 671 (App. Div.), certif. denied, 141 N.J. 98 (1995). If a contract's language is plain, that language alone must determine the agreement's effect. Manahawkin Convalescent, supra, 217 N.J. at 118. A contract "must be construed as a whole," and a court should endeavor to construct a contract in the manner "most equitable to the parties."

21                                                        A-1475-14T1

Krosnowski v. Krosnowski, 22 N.J. 376, 387-88 (1956) (citation omitted). Further, every New Jersey contract "contains an implied covenant of good faith and fair dealing," intended to ensure that neither party does anything which destroys or injures the right of the other party to receive the benefit of the contract. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997). However, this implied covenant cannot override an unambiguous, express term in a contract, id. at 419, and a court must not "'interfere to substitute a different and more liberal agreement' than that which existed between the parties." Gillman v. Bally Mfg. Corp., 286 N.J. Super. 523, 528 (App. Div.) (quoting Fox v. Haddon Twp., 137 N.J. Eq. 394, 398 (Ch. 1945)), certif. denied, 144 N.J. 174 (1996).

The courts have enforced stock option contracts strictly. Id. at 529. For example, in Gillman, the court enforced an express term in a stock option contract delineating the time for the exercise of an option. Id. at 529-531. The plaintiff's untimely request to exercise his option resulted in the forfeiture of a right to which he was otherwise entitled. Nonetheless, we found that despite the "harsh result[], a court must act only upon the language of the written contract." Id. at 528 (quoting Fredericks v. Georgia-Pacific Corp., 331 F. Supp. 422, 427 (E.D.Pa. 1971)).

Similarly, in <u>Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Associates</u>, 182 <u>N.J.</u> 210, 223 (2005), the plaintiff did not abide by the strict terms governing exercise of its option contract with the defendant to enter into a long-term lease for a property it occupied. Because the plaintiff failed to pay the option price along with its request to exercise the option, as expressly required by the contract, the Court stated that ordinarily, it would "suffer the consequences of its default." <u>Ibid.</u> Only because the defendant acted in bad faith by deliberately withholding information from the plaintiff about the deficiency in its request for years until after the deadline expired, despite the plaintiff's diligent efforts, did the Court find that the plaintiff was entitled to specific performance of the option contract. <u>Id.</u> at 224-32.

B.

Hammer contends that the court erred in dismissing his breach of stock option claim on partial summary judgment. HSI's Stock Option Program (SOP), granted Hammer the option to purchase up to 1350 shares of stock at a price of $267 per share. On or after November 1, 2001, Hammer could exercise his option to purchase up to 270 shares. Then, on or after each anniversary of that date, he could exercise the option to buy up to an additional 270 shares, until all of the 1350 shares had been bought. The option could

be exercised by giving written notice to the Secretary of HSI, "accompanied by payment of the option price for the total number of shares" Hammer wished to purchase.

The SOP provided:

> The payment may be in any of the following forms: (a) cash, which may be evidenced by a check and includes cash received from a stock brokerage firm in a so-called "cashless exercise;" (b) . . . certificates representing shares of Common Stock of the Company . . . or (c) . . . any combination of cash and Common Stock of the Company . . .

The SOP further stated that Hammer's option would terminate thirty days after the date on which his employment with HSI ended other than by reason of disability or death.

On November 1, 2002, within the thirty-day window after his termination on October 18, Hammer wrote to HSI stating that he wished to exercise his option to purchase the 270 shares of stock available as of November 1, 2001. The letter stated that he wished to use $72,090 of the $125,000 in deferred compensation held by the company as payment for the shares. On November 15, 2002, HSI denied Hammer's request, stating that he had failed to comply with the SOP's requirement that the request to purchase be accompanied by cash or its equivalent.

Hammer sent a second letter stating that he had earned the compensation by working for the year in which it was deferred, and

24

that it was due and owing to him, and income solely in the company's control. He asserted that this indebtedness was the equivalent of cash for purposes of exercising his stock option. HSI replied on December 10, 2002, disagreeing that his deferred compensation was due at that time.[3]

Grant of partial summary judgment on this issue was thus proper. The SOP explicitly provided that Hammer was expected to make his request "accompanied by payment of the option price." He did not do so. The express terms of the SOP were clear and unambiguous, and there is no evidence that defendants' response to his request was made in bad faith, as the company disputed his entitlement to the funds. Defendants clearly explained the deficiency and responded promptly. The judge's strict construction of the purchase terms were was not error.

V.

The Supreme Court has described the valuation of a closely-held corporation as "inherently fact-based[]" and "not an exact science." Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 368 (1999). Factual findings of a trial judge on the subject of a corporation's value thus are shown "great deference," and should not be disturbed unless they are clearly erroneous or demonstrate

---

[3]    Ultimately, HSI did not pay Hammer this compensation until July 28, 2009.

an abuse of discretion. <u>Ibid.</u> Further, "[d]eference should be given to those findings of the trial judge that are substantially influenced by his or her opportunity to hear and see witnesses and to have the feel of the case." <u>Valdez v. Tri-State Furniture</u>, 374 <u>N.J. Super.</u> 223, 231-32 (App. Div. 2005).

"Valuing a closely-held corporation is a difficult task." <u>Torres v. Schripps, Inc.</u>, 342 <u>N.J. Super.</u> 419, 435 (App. Div. 2001) (citation omitted). In determining fair value, "the judge should consider 'proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court.'" <u>Id.</u> at 434 (quoting <u>Balsamides</u>, <u>supra</u>, 160 <u>N.J.</u> at 375). Valuation "depends upon the judgment and experience of the appraiser and the completeness of the information upon which his conclusions are based." <u>Bowen v. Bowen</u>, 96 <u>N.J.</u> 36, 44 (1984). Moreover, the court is not bound to accept a valuation provided by any particular expert witness. <u>Torres</u>, <u>supra</u>, 342 <u>N.J. Super.</u> at 431.

Hammer argues that the court erred when calculating the fair value of his share of HSI because the court should have allowed an add-back to HSI's total value of a $630,238 "CEO expense" and a $137,812 "royalty expense." He contends these expenses were non-recurring.

The findings of a court in a bench trial, however, are "considered binding on appeal when supported by adequate, substantial and credible evidence" and when they are not "so wholly insupportable as to result in a denial of justice." Rova Farms Resort, supra, 65 N.J. at 483-84 (citation omitted).

Hammer's expert witness Chris Campos asserted that his salary and benefits should be "added back" into HSI's income for purposes of determining the company's value, because these expenses were non-recurring. After Hammer's termination, HSI eliminated the CEO position entirely. However, the court agreed with defendants' expert witness Gerald Shanker that to add back the figure was not supported by the facts.

Hammer's salary and benefits "were plainly recurring when paid to him," and were not rendered a "non-recurring expense retroactively" after he was fired and his position eliminated. His hiring was not an "extraordinary event," and his functions and duties were not outside the normal scope of a CEO position. For these reasons, the judge disallowed an add-back to HSI's value of $630,238 representing amounts paid to Hammer as salary and benefits.

Hammer claimed that $137,812 should be added back to HSI's value for the year 2002, representing royalty payments to product manufacturers with which HSI did business in that year. The court

27

disagreed that these payments were a non-recurring expense, stating that Campos's conclusion on the subject was a net opinion. The court instead credited Shanker's characterization of the payments as "normal business transactions" for a company like HSI because, as Shanker noted, product manufacturers "often produce products under license and receive a royalty therefore." Although HSI may not have made royalty payments frequently, the payments made in 2002 were "acceptable" and Hammer offered no evidence challenging their validity. As a result, the court disallowed the add-back of this expense.

The court's conclusion that neither of the disputed expenses should be added back into HSI's fair value is supported by the testimony of a credible expert witness. That the trial judge agreed with defendants' expert, not Hammer's, does not render his decision an abuse of discretion. Rather, by the standards discussed above, great deference is given to a judge's determination that one expert was more credible than another. In light of the fact-sensitive nature of valuing a closely-held corporation, the court's findings were supported by adequate, substantial and credible evidence, and did not result in a denial of justice. Rova Farms Resort, supra, 65 N.J. at 483-84.

A trial judge's decision on an application for fees is reviewed under an abuse of discretion standard. United Hearts v. Zahabian, 407 N.J. Super. 379, 390 (App. Div.) (citing Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)), certif. denied, 200 N.J. 367 (2009). "[F]ee determinations by trial courts will be disturbed only on the rarest of occasions," Rendine v. Pantzer, 141 N.J. 292, 317 (1995), such as when an award "was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Masone, supra, 382 N.J. Super. at 193. This is because a trial court is "in the best position to weigh the equities and arguments of the parties." Packard-Bamberger & Co., Inc. v. Collier, 167 N.J. 427, 447 (2001).

As a result of the litigation, Hammer received $81,594[4] for his two percent interest in HSI, plus counsel fees, costs, and expert fees totaling $758,956.29, in addition to $34,006.23 in prejudgment interest. The court granted defendants $186,276.27 in fees unrelated to Hammer's OMS claims, which is the only decision with which we do not agree, and which we reverse.

---

[4] $60,000 towards the value of Hammer's share was voluntarily paid by defendant prior to the trial date.

Because Hammer was declared an OMS, he sought reimbursement of counsel fees and costs under the OMS statute's fee-shifting provision. N.J.S.A. 14A:12-7(8)(d) provides that if, as here, the court finds that an action was maintainable under N.J.S.A. 14A:12-7(1)(c), it may award reasonable fees and expenses of counsel to a "selling shareholder," meaning a party receiving the fair value of their stock in the close corporation as a remedy for oppression.

Once it is determined that a plaintiff is a prevailing party under a fee-shifting statute, the judge must compute a "lodestar" amount for fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. R.M. v. Supreme Court of N.J., 190 N.J. 1, 10 (2007). This amount may then be reduced or enhanced in the court's discretion. Id. at 10-11. A court must analyze any relevant factors when determining the final fee award, and must then state its reasons on the record. Id. at 12.

A reduction of a party's requested attorney fees may be appropriate if

> the hours expended, taking into account the damages prospectively recoverable, the interests to be vindicated, and the underlying statutory objectives, exceed those that competent counsel reasonably would have expended.

A fee should also be reduced if "the level of success achieved in the litigation is limited as compared to the relief sought." Id. at 336. "[W]hen a party has succeeded on only some of its claims for relief, the trial court should reduce the lodestar to account for the limited success." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 387 (2009) (citation omitted). Such action may be taken "even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." Rendine, supra, 141 N.J. at 336 (quoting Hensley v. Eckerhart, 461 U.S. 424, 436, 103 S. Ct. 1933, 1941, 76 L. Ed. 2d 40, 52 (1983)).

The courts have rejected a purely mathematical approach comparing the total number of issues raised by a plaintiff with those he or she actually prevailed upon. New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corr., 185 N.J. 137, 154 (2005). However, "hours devoted to claims that are entirely distinct from the relevant successful claims should be excluded" from a fee award. Singer v. State, 95 N.J. 487, 500, cert. denied, 469 U.S. 832, 105 S. Ct. 121, 83 L. Ed. 2d 64 (1984). If a plaintiff's unsuccessful claims are not fully distinct, and instead are "related to the successful claims, either by a 'common core of facts' or 'related legal theories,'" the court must analyze "the significance of the overall relief obtained to determine

whether those hours devoted to the unsuccessful claims should be compensated." Ibid. (quoting Hensley, supra, 461 U.S. at 435, 103 S. Ct. at 1940-41, 76 L. Ed. 2d at 51-52).

If the plaintiff obtained "excellent results" despite not succeeding on every claim raised, his or her attorney "should be duly compensated for all time reasonably expended on the litigation." Robb v. Ridgewood Bd. of Educ., 269 N.J. Super. 394, 405 (App. Div. 1993). If, on the other hand, the plaintiff obtained only "partial or limited success," the court "may reduce the lodestar amount if it believes that amount is excessive in relation to the plaintiff's relief." Ibid.

Ultimately, "there need not be proportionality between the damages recovered and the attorney-fee award itself." Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 23 (2004). "Nonetheless, the amount a plaintiff recovers in damages is relevant to the determination of whether the fees sought are reasonable." Grubbs v. Knoll, 376 N.J. Super. 420, 432 (App. Div. 2005). Particularly where the fees requested far exceed the damages recovered by the prevailing party, "the trial court should consider the damages sought and the damages actually recovered" when determining an appropriate fee award. Packard-Bamberger, supra, 167 N.J. at 446.

A trial court must "evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for

the prevailing party to support the fee application." Rendine, supra, 141 N.J. at 335. An application for fees "should be sufficiently detailed to allow a trial court to determine the nature of the work performed and by whom, as well as the reasonableness of the hourly rate and the hours expended." Furst, supra, 182 N.J. at 25. Where "an attorney's time . . . substantially exceed[s] the result obtained for the client," an attorney is particularly "obliged to document the effort" he or she has undertaken. Grubbs, supra, 376 N.J. Super. at 433.

C.

The trial judge here carefully reviewed Hammer's request for $1,222,610.19 in attorney's fees. Current counsel indicated which charges related solely to successful OMS claims. However, some charges were not so clearly designated, and required the judge's close scrutiny. After careful evaluation, he awarded Hammer a total of $635,467.96 for counsel fees related to only the OMS claims. We see no abuse of discretion in the judge's analysis of the materials and his discussion of the legal principles that guided his examination.

Hammer also sought a total of $181,491.84 for his expert fee as well as $29,186.45 for litigation expenses. Because in the trial judge's opinion Hammer did not adequately explain these costs, he reduced the request by forty percent to $108,895.10 for

Campo's fee and by fifty percent to $14,593.23 for other fees. Thus the total amount awarded for counsel fees, costs, and related litigation expenses came to $758,956.29. That figure is disproportionate to Hammer's recovery which came to $81,594 — the fair value of his remaining interest in HSI and prejudgment interest of $34,006.23.

Under the OMS statute, however, a proportionality analysis is not applied to the detriment of a plaintiff seeking the protection of the statute. The trial judge considered this very point, and noted that defendants' total award came to $202,594 including his deferred compensation payment, the fee was "approximately seven times the overall recovery," and thus reasonable. We are constrained to agree given the OMS statute and the judge's careful and detailed review of the billing records. He did not abuse his discretion.

## VII.

Defendants also object to the prejudgment interest totaling $34,006.23. They assert Hammer caused "much of the delay in this litigation." Certainly, the number of years this matter has been pending approaches on the Dickensian. But defendants themselves caused significant delay by pursuing an interlocutory appeal of a grant of partial summary judgment awarding Hammer $166,913.86,

including interest, in deferred compensation payable under the terms of his employment contract.

Under N.J.S.A. 14A:12-7(8)(d), the court may award interest on a minority shareholder's interest representing the fair value of his or her share in a closely-held corporation if, as here, he or she is successful in an action under N.J.S.A. 14A:12-7(1)(c). This interest "may be allowed at the rate and from the date determined by the court to be equitable." N.J.S.A. 14A:12-7(8)(a).

"Generally, the awarding of prejudgment interest is subject to the trial judge's broad discretion in accordance with principles of equity." Musto v. Vidas, 333 N.J. Super. 52, 74 (App. Div.), certif. denied, 165 N.J. 607 (2000). An appellate court must defer to the trial judge's discretion "unless it represents a manifest denial of justice." Ibid.

> The primary consideration in awarding prejudgment interest is that "the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled."
>
> [Ibid. (quoting Rova Farms Resort, supra, 65 N.J. at 506).]

N.J.S.A. 14A:12-7(8)(d) provides that if the successful minority shareholder's refusal to accept an offer of payment was

"arbitrary, vexatious, or otherwise not in good faith, no interest shall be allowed." Ibid. However, in Musto, supra, 333 N.J. Super. at 74, the court found that although the defendants made a buyout offer for the plaintiff's stock that was greater than the plaintiff's ultimate award, this "[did] not mean that [the] plaintiff's refusal to accept such an offer constitute[d] unjustified delay." Instead, the defendants were responsible for much of the delay that extended the proceedings, because they filed an interlocutory appeal. Ibid.

Like the trial judge, we do not agree that Hammer pursued meritless claims requiring aggressive pursuit by defendants of summary judgment applications and dismissals prior to trial. The record is devoid of support of the notion that Hammer pursued the complaint in bad faith. Thus the trial court did not abuse its discretion in awarding prejudgment interest under N.J.S.A. 14A:12-7(8)(d).

## VIII.

On June 30, 2009, defendants filed an offer of judgment which would have allowed Hammer to take judgment against them in the amount of $51,150 including costs but excluding litigation expenses, prejudgment interest and counsel fees. Hammer did not accept. Because Hammer ultimately received a net award for his OMS claim of $21,594, a significantly lower amount than defendants

offered, defendants sought counsel fees and costs under the Offer of Judgment Rule (OJR), <u>Rule</u> 4:58-3(c).

The OJR provides that

> [i]f the offer of a party other than the claimant is not accepted, and the claimant obtains a monetary judgment . . . that is favorable to the offeror as defined by this rule, the offeror shall be allowed, in addition to costs of suit, the allowances as prescribed by <u>R.</u> 4:58-2 . . . .

> [<u>R.</u> 4:58-3(a).]

<u>Rule</u> 4:58-2(a) provides for an award of all reasonable litigation expenses incurred following the rejection of the offer, prejudgment interest, and "a reasonable attorney's fee for such subsequent services as are compelled by the non-acceptance." A determination in the claimant's favor that entitles an offering party to such an allowance is "a money judgment . . . in an amount, excluding allowable prejudgment interest and counsel fees, that is 80% of the offer or less." <u>R.</u> 4:58-3(b). Under <u>Rule</u> 4:58-3(c), no such allowances shall be granted if "(4) a fee allowance would conflict with the policies underlying a fee-shifting statute or rule of court."

Here, the court eventually found that the value of Hammer's two percent interest in HSI was $81,594, but defendants had already paid $60,000 of that sum. Hence the judge concluded that Hammer received a net award on his OMS claim of only $21,594. Because

37

this amount was less than 80% of defendants' offer, the court found that "[Hammer]'s failure to accept the offer of judgment entitles the defendant[s] to an award of reasonable litigation expenses and attorney's fees from June 30, 2009 through the entry of final judgment."

We respectfully disagree with the trial judge's characterization of the full amount owed to Hammer on his OMS claim as $21,594. The $60,000 HSI earlier paid, we were advised at oral argument, was payment on account of the stock. The discrepancy in the figures was a dispute regarding valuation. Because defendants prepaid a portion of the total finally assessed against them is no reason to exclude that portion from the total recovery Hammer actually obtained because of the litigation. If that amount is added back in, the total is $81,594, an amount greater than the figure in the offer of judgment notice. Accordingly, we reverse on this point.

Affirmed, except reversed as to the award of attorney fees to defendants.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1475-14T1